WILLIAM J. GOODMAN, GLORIA GOODMAN, BARRY S. GOODMAN, MICHAEL A. GOODMAN, LAUREN B. GOODMAN, NORMAN A. ROSSMAN, MARILYN ROSSMAN, AND PAULA M. ROSSMAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3229–78.    Filed July 16, 1980.

*Charles H. Egerton* and *Lauren B. Goodman,* for the petitioners.

*Thomas K. Purcell,* for the respondent.

SCOTT, *Judge:* Respondent determined the following deficiencies and additions to tax under section 6653(a), I.R.C. 1954,[1] in petitioners' Federal income taxes for the calendar year 1973:

| Name | Deficiencies in income tax | Additions to tax under sec. 6653(a) |
| --- | --- | --- |
| William J. and Gloria Goodman | $55,346.51 | $2,767.33 |
| Norman A. and Marilyn Rossman | 51,701.07 | 2,585.05 |
| Barry S. Goodman | 865.00 | 0 |
| Lauren B. Goodman | 865.00 | 0 |
| Michael A. Goodman | 705.05 | 0 |
| Paula M. Rossman | 692.00 | 0 |

Following concessions by each of the parties, the issues remaining for decision are: (1) Whether the sale of apartments by petitioners William J. Goodman and Norman A. Rossman to six trusts of which they were trustees and the sale by the trusts the following day to an unrelated party should be regarded as a single sale from petitioners William J. Goodman and Norman A. Rossman to the unrelated party for Federal income tax purposes; and (2) whether the unrelated party, if the transactions are viewed as one, or the trusts, if both transactions are recognized, "assumed" the mortgage on the apartments or took the apartments "subject to" the mortgage so that the excess of the mortgage over the basis of the property to Mr. Goodman and Mr. Rossman is included in the first-year payments to them under the installment method of reporting income.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners William J. and Gloria Goodman, husband and wife, who resided in Altamonte Springs, Fla., at the time of the filing of their petition in this case, filed a joint Federal income tax return for the calendar year 1973 with the Internal Revenue Service Center in Chamblee, Ga.

Petitioners Norman A. and Marilyn Rossman, husband and wife, who resided in Orlando, Fla., at the time of the filing of their petition in this case, filed a joint Federal income tax return

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the years in issue.

for the calendar year 1973 with the Internal Revenue Service Center in Chamblee, Ga.

Petitioner Barry S. Goodman, who resided in Altamonte Springs, Fla., at the time of the filing of the petition in this case, filed a Federal income tax return for the calendar year 1973 with the Internal Revenue Service Center in Chamblee, Ga.

Petitioner Lauren B. Goodman, who resided in Altamonte Springs, Fla., at the time of the filing of the petition in this case, filed a Federal income tax return for the calendar year 1973 with the Internal Revenue Service Center in Chamblee, Ga.

Petitioner Michael A. Goodman, who resided in Tucson, Ariz., at the time of the filing of the petition in this case, filed a Federal income tax return for the calendar year 1973 with the Internal Revenue Service Center in Chamblee, Ga.

Petitioner Paula M. Rossman, who resided in Orlando, Fla., at the time of the filing of the petition in this case, filed a Federal income tax return for the calendar year 1973 with the Internal Revenue Service Center in Chamblee, Ga.[2]

The Executive House Apartments partnership (the EHA partnership), owned equally by petitioners William J. Goodman and Norman A. Rossman, filed a Federal United States Partnership Return of Income, Form 1065, for the calendar year 1973 with the Internal Revenue Service Center in Chamblee, Ga.

Petitioner William J. Goodman (Mr. Goodman) has been in the real estate business—investment, development, construction, and operation—since 1946. Petitioner Norman A. Rossman (Mr. Rossman) has been in the real estate business—investment, development, construction, and operation—since 1956. Mr. Goodman and Mr. Rossman through various entities have conducted their real estate business together since 1958.

On February 23, 1961, Morris Pianka, Mr. Goodman's father-in-law, created the Lauren Beth Goodman Trust, the Michael

---

[2]The parties' stipulation states that petitioners' addresses were the above, but does so in the present tense and does not relate the addresses to the filing of the petition. The petition alleges addresses at the time of filing the petition which differ significantly for petitioners Michael A. Goodman and Paula M. Rossman. The petition alleges that at the time of filing, Michael A. Goodman lived in Altamonte Springs, Fla., and that Paula M. Rossman lived in Boulder, Colo. Respondent's answer, however, neither admits nor denies the addresses as alleged in the petition, because respondent lacked information or knowledge sufficient to form a belief as to the truth of the allegation. Under these circumstances, we have assumed that the parties intended the stipulation as to the addresses of petitioners to be those at the time of filing the petition.

Allen Goodman Trust, and the Barry Stuart Goodman Trust (the Goodman trusts). Mr. Pianka contributed $2,500 to each of the three trusts at their inception. No further contributions were made to the trusts. Mr. Goodman was designated the trustee of each trust at inception, and the beneficiaries of the three individual trusts were Mr. Goodman's three children, Lauren, Michael, and Barry, respectively.

On February 23, 1961, Sadye Rossman, Mr. Rossman's mother, created the Paula Michele Rossman Trust, the Ruth Jordana Rossman Trust, and the Nancy Ann Rossman Trust. Sadye Rossman contributed $2,500 to each of the three trusts at their inception. No further contributions were made to the trusts. Mr. Rossman was designated the trustee of each trust at inception, and the beneficiaries of the three individual trusts were Mr. Rossman's three children, Paula, Ruth, and Nancy, respectively.

The six declarations of trust were identical except for the individuals named as grantor, trustee, and beneficiary. The trustee was given great discretion in his decisions on investments and distributions. Paragraph (7) of each "Declaration of Trust" provided that "In the administration of the Trust, the Trustee shall have the following powers, all of which shall be exercised in a fiduciary capacity, solely in the interest of the beneficiaries." Subparagraphs (a) through (o) of paragraph (7) enumerated broad powers of the trustee (1) to hold as an investment for the trust any property as long as he deems proper, whether or not the property is income producing; (2) to rent or lease trust property upon such terms and conditions as he deems proper; (3) to sell or convey trust property or to exchange it for other property or for stock in a corporation (whether or not created by him); (4) to make repairs or improvements to the trust property; (5) to pay out trust moneys for proper trust expenses; (6) to vote trust securities; (7) to consent to the reorganization, consolidation, merger, or other change in any corporation in which the trust holds stock; (8) to settle or defend any claim against the trust; (9) to pay expenses of administering the trusts, including reasonable attorneys' and accountants' fees; (10) to act for the trust through an agent or attorney; (11) to borrow money for the trust upon his bond or note as trustee; (12) to lend moneys of the trust to any persons upon such terms as he deems advisable; (13) to invest the trust property as a general or limited partner; (14) to take trust property in his

name without describing himself as trustee; and (15) to make distribution of the trust property in kind or in money or in both.

Paragraph (7)(p) of the declaration, the concluding statement of that paragraph, and paragraph (8) read as follows:

(p) The Trustee may freely act under all or any of the powers by this agreement given to him in all matters concerning the Trust herein created, after forming his judgment based upon all the circumstances of any particular situation as to the wisest and best course to pursue in the interest of the Trust and the beneficiaries hereunder, without the necessity of obtaining the consent or permission of any person interested therein, or the consent or approval of any court, and notwithstanding that he may also be acting individually, or as trustee of other trusts, or as agent for other persons or corporations interested in the same matters, or may be interested in connection with the same matters as stockholder, director, or otherwise, provided, however, that he shall exercise such powers at all times in a fiduciary capacity primarily in the interest of the beneficiaries hereunder.

The powers herein granted to the Trustee may be exercised in whole or in part, from time to time, and shall be deemed to be supplementary to and not exclusive of the general powers of trustees pursuant to law, and shall include all powers necessary to carry the same into effect.

(8) Notwithstanding anything herein contained to the contrary, no powers enumerated herein or accorded to trustees generally pursuant to law shall be construed to enable the Grantor, or the Trustee, or any other person, to purchase, exchange, or otherwise deal with or dispose of all or any part of the corpus or income of the Trust for less than an adequate consideration in money or money's worth, or to enable the Grantor or Trustee to borrow all or any part of the corpus or income of the Trust, directly or indirectly, without adequate interest or security.

The trusts were irrevocable and terminated in favor of the beneficiary when the beneficiary reached the age of 35.[3]

On July 2, 1965, and August 2, 1965, Mr. Goodman and Mr. Rossman each acquired an undivided 50-percent interest in parcels of real property located in Orange County, Fla. On February 23, 1967, Mr. Goodman and Mr. Rossman each acquired an undivided 50-percent interest in contiguous additional parcels.

In 1966 and 1967, Mr. Goodman and Mr. Rossman constructed the first two phases of the Executive House Apartments (the apartments) which contained 140 apartment units. Beginning in

---

[3]If the beneficiary died before attaining age 35, the trust instrument made alternative provision for the ultimate distribution of the trust assets.

1966, the apartments were owned and operated by Mr. Goodman and Mr. Rossman as a partnership (the EHA partnership).

In 1969, the EHA partnership built phase three of the apartments, an additional 108 units. When completed, the apartments consisted of 112 two-bedroom units, 68 one-bedroom units, 68 efficiency units, 3 swimming pools, 2 tennis courts, several laundry rooms, and a cardroom.

Permanent financing for the apartments was provided by Metropolitan Life Insurance Co. (Metropolitan) on June 19, 1968. Mr. Goodman and Mr. Rossman executed three promissory notes to obtain initial financing for the apartments. The first was signed on March 7, 1966, payable to Charter Mortgage Co. with an original principal amount of $675,000 and interest of 6 percent per annum. The second was signed on December 27, 1966, payable to Citizens National Bank of Orlando with an original principal amount of $475,000 and interest of 7¼ percent per annum. The third was signed on June 14, 1967, payable to American National Bank of Jacksonville with an original principal amount of $700,000 and interest of 6.875 percent per annum. Subsequently, all three of the initial notes were assigned to Metropolitan. The notes were all secured by mortgages. The notes and mortgages were the subject of a Consolidation, Modification, and Spreading Agreement entered into by Metropolitan with Mr. Goodman and Mr. Rossman on June 19, 1968.[4]

---

[4]The Consolidation, Modification, and Spreading Agreement in part provides as follows:

"FIRST: That the lien of the two (2) mortgages above described (the mortgages which have previously been consolidated, modified and spread being referred to as one (1) consolidated mortgage), is spread, consolidated and coordinated so that together they shall hereafter constitute in law but one first mortgage, a single lien upon the property described as follows:

"(A) * * * [the EHA land]

"(B) * * * [the EHA buildings, structure improvements, etc.]

"SECOND: That the notes secured by the said mortgages are spread, consolidated and coordinated so that together they shall hereafter constitute in law but one note in the principal amount of One Million Eight Hundred Nineteen Thousand Three Hundred Seventy-nine and 56/100 Dollars ($1,819,379.56), which said principal amount shall bear interest at the rate of 6.65% per annum, from June 19, 1968, and the parties hereto agree that the aggregate principal balance with interest thereon from the date hereof at the rate above specified, shall be paid upon the dates and in the modified and combined amounts as follows:

"On the first day of JULY, 1968, there shall be paid interest on the principal balance of $1,819,379.56 at the rate of 6.65% from June 19, 1968. On the first day of AUGUST, 1968, and continuing on the first day of each and every month thereafter, to and including the first day of JULY, 1973, there shall be paid the sum of $14,277.23. On the first day of AUGUST, 1973, and continuing on the first day of each and every month thereafter there shall be paid the sum of $13,783.48, except that the entire indebtedness evidenced hereby, if not sooner paid, shall be due and payable on the first day of FEBRUARY, 1987. Payments as made shall be applied first

The consolidated loan had a principal amount of $1,819,379.56 with an annual interest rate of 6.65 percent.

In the latter part of 1972, Mr. Goodman and Mr. Rossman decided that the value of apartment houses in the Orlando, Fla., area had reached its peak and that it would therefore .be an opportune time to sell the apartments. Having decided to sell, they met with their accountants and tax attorneys and projected the results of a sale. It was decided that a cash sale was not attractive because of the income tax liability on such a sale. Additionally, neither Mr. Goodman nor Mr. Rossman was in need of immediate cash because of his success in other real estate ventures at that time. Therefore, an installment sale was suggested. Furthermore, it was suggested by the tax advisers that the sale be structured with an intermediate installment sale to the Goodman and Rossman trusts followed by a sale to the ultimate purchaser. It was also suggested that Mr. Goodman and Mr. Rossman replace themselves with institutional trustees before making the installment sale to the trusts. Mr. Goodman and Mr. Rossman decided to use the two-step installment sale, but rejected the institutional trustee suggestion.[5]

By April 30, 1973, each of the Goodman and Rossman trusts had a net book value of approximately $93,000 and a net fair

---

to the payment of interest at the rate of 6.65% per annum on the principal balance of the loan from time to time unpaid, and the balance of said payment shall be applied to principal.

"Privilege is reserved to prepay this note in full on the first day of any month commencing August 1, 1979, upon sixty (60) days written notice, and upon payment of a prepayment fee computed as follows:

"From August 1, 1979, to and including July 1, 1980—3%; on August 1, 1980, and on the first day of August in each year thereafter, said prepayment fee shall reduce at the rate of one-half of one per cent (½ of 1%) to and including July 1, 1983. On and after August 1, 1983, said prepayment fee shall be one per cent (1%) where it shall remain.

\*     \*     \*     \*     \*     \*     \*

"THIRD: Notwithstanding anything in the mortgages and notes to the contrary, in the event of a default hereunder or under the notes or mortgages hereby spread, consolidated and coordinated, by reason of which the holder accelerates maturity of the debt evidenced by the said notes and secured by the said mortgages, and hereby evidenced and secured, the holder shall not be entitled to a deficiency judgment.

\*     \*     \*     \*     \*     \*     \*

"SEVENTH: The said mortgages, as hereby spread, consolidated and coordinated, shall constitute a security agreement under the provisions of the Florida Uniform Commercial Code.

"This Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators and assigns, or successors and assigns of the parties of the first and second parts."

[5] Mr. Rossman and Mr. Goodman felt that an institutional trustee would be merely "cosmetic" and that such a trustee could not possibly handle the then-substantial real estate investments of the trusts as well as experts in the Orlando real estate market such as themselves.

market value in excess of $600,000. The tremendous appreciation in the value of the trusts, all from an initial contribution of $2,500, was the result of investments by the trustees in the central Florida real estate market. Mr. Goodman remained as the trustee for the Goodman trusts until 1974 or 1975, when the Goodman trusts were terminated. Mr. Rossman was still trustee of the Rossman trusts at the time of the trial of this case.

Mr. Goodman and Mr. Rossman contacted a real estate broker and informed him of how the transaction was to be structured, and it was agreed that a sales commission would be paid only on the sale by the trusts to the third party. During negotiations, prospective buyers were informed that Mr. Goodman and Mr. Rossman were acting as trustees of the trusts.

Mr. Goodman and Mr. Rossman entered into a contract dated March 15, 1973, with Mr. Rossman, as trustee for the Rossman trusts, and Mr. Goodman, as trustee for the Goodman trusts, for the sale of the apartments.[6] The purchase price of the land and improvements was $3,750,000, payable $100,000 at closing and the balance to be payable on or before April 30, 1993. Interest was payable monthly on the outstanding principal balance at the rate of 6.65 percent per annum. The furniture and fixtures located in the apartments were also to be sold for $100,000 in cash. With respect to the Metropolitan mortgage, the contract provided the following:

This conveyance shall be subject to various mortgages payable to Metropolitan Life Insurance Company which shall be paid by Grantors according to the terms and provisions therein set forth in such mortgages. This note shall be payable only at a banking institution, which shall deduct from each payment received by it the amount required to pay principal and interest installments of the various Metropolitan mortgages and remit the same to such Mortgagee.

On April 30, 1973, the outstanding unpaid principal balance on the Metropolitan mortgage was $1,533,356.30.

Mr. Rossman, as trustee of the Rossman trusts, and Mr. Goodman, as trustee of the Goodman trusts, entered into a contract dated March 16, 1973, for the sale of the apartments to David E. Dick and/or his assigns. The purchase price of the land and improvements was $3,850,000 which was payable $600,000 at

---

[6]The parties have sometimes referred to Mr. Goodman and Mr. Rossman as the sellers of the property, and at other times, to the partnership as the seller. We have also followed this interchangeable use of the names of the individuals and of the partnership.

closing and the balance in equal monthly installments of principal and interest (computed at the rate of 8 percent per annum) of $25,086 for 25 years until 1998. The furniture and fixtures were to be sold for $100,000. Paragraph 19 of the contract provided as follows:

*Wraparound Mortgage Feature:* It is specifically understood and agreed between the parties hereto that the purchase money mortgage referred to herein is a wraparound mortgage and the purchase money promissory note and mortgage includes the unpaid principal balance outstanding on the mortgage referred to herein as being held by The Metropolitan Life Insurance Company.

On April 30, 1973, the sale to the trusts was closed in accordance with the contract for sale and purchase. The EHA partnership had an adjusted basis in the land and building of the apartments, exclusive of furniture and fixtures, of $1,101,593. The expenses incurred by the EHA partnership in the sale to the trusts were $14,121.60, and the expenses of the trusts were $3,191.50. The closing statement credited the buyer with a $24,000 deposit and showed cash paid on closing of $76,061.48. A promissory note for $3,650,000 and mortgage were given by the trusts to Mr. Goodman and Mr. Rossman as security for the balance of the purchase price.[7] The mortgage was not recorded

---

[7]An addendum to the mortgage from the trusts to Mr. Goodman and Mr. Rossman in pertinent part read as follows:

### ADDENDUM TO MORTGAGE

FROM: NORMAN A. ROSSMAN, a.k.a. N. A. ROSSMAN, as Trustee of THE PAULA MICHELE ROSSMAN TRUST, THE RUTH JORDANA ROSSMAN TRUST and THE NANCY ANN ROSSMAN TRUST * * * ; and WILLIAM J. GOODMAN, as Trustee of THE LAUREN BETH GOODMAN TRUST, THE MICHAEL ALLEN GOODMAN TRUST and THE BARRY STUART GOODMAN TRUST * * * , as Mortgagor

TO:  NORMAN A. ROSSMAN and WILLIAM J. GOODMAN, as Mortgagee.

1. This mortgage is subject and subordinate to those certain mortgages as described hereinbefore and as more fully described in that Consolidation, Modification and Spreading Agreement dated June 19, 1968 * * * , which mortgages as consolidated are presently owned by Metropolitan Life Insurance Company, constitutes a first mortgage lien on the property described in Exhibit "A" hereof as Parcel One, and matures on February 1, 1987 (such mortgages as consolidated being hereinafter referred to as "First Mortgage").

2. Mortgagee agrees to pay to the holder of the First Mortgage the unpaid principal balance of the First Mortgage, together with all interest and escrow payments thereon accruing thereunder from May 1, 1973, as and when required by the terms of the First Mortgage, i.e., by paying the monthly installments of principal and interest together with escrow payments due under the promissory note secured by the First Mortgage until the obligation evidenced by said note has been satisified (except as provided in Paragraph 3 hereinafter of this Addendum). All such payments provided to be paid by the Mortgagee pursuant to the provisions of this

because Mr. Goodman and Mr. Rossman believed that the expense of recording was unnecessary. They felt that everyone would be adequately protected when the mortgage on the subsequent sale was recorded. The third paragraph of the note provided as follows:

The place of payment of this note shall only be a banking institution doing business in the State of Florida. The monthly interest payments as set forth herein, shall be made by Maker provided that Maker has the written commitment of the bank, as collecting agent of payees, that as long as Maker makes the payments due hereunder, the bank will then make each monthly mortgage payment to the Metropolitan Life Insurance Company (more particularly identified hereinafter) required to be made by Payees in accordance with the terms and provisions of the contract for sale and purchase of EXECUTIVE APARTMENTS by and between the parties hereto.

---

paragraph 2 shall be made by Mortgagee as and when due and before the expiration of the applicable grace periods, if any, provided for such payments as set forth in the First Mortgage.

3. The promissory note executed by Mortgagor on even date herewith may not be prepaid except in the total amount in excess of the balance then due and owing to Metropolitan Life Insurance Company on the property which is subject to this Mortgage and such prepayment as provided herein may be made only after January 1, 1974. Upon receipt of such payment, Mortgagee herein will satisfy and discharge this Mortgage.

4. Mortgagor acknowledges that it is familiar with the prepayment reservation and prepayment penalty contained in the First Mortgage on the subject property in favor of Metropolitan Life Insurance Company.

5. Mortgagor agrees to provide Metropolitan Life Insurance Company with any reports which are required to be furnished by the terms of its mortgages.

6. Mortgagor agrees that in addition to the monthly payments to be made by it to the Mortgagee pursuant to the terms of the promissory note executed on even date herewith, it shall, in addition, on the first day of each month reimburse the Mortgagee for the escrow items paid by the Mortgagee to the Metropolitan Life Insurance Company in accordance with the terms of the First Mortgage.

7. In the event that the unpaid principal balance of the First Mortgage is reduced by the holder of the First Mortgage applying insurance proceeds, proceeds received from condemnation or from money in escrow or from rents, profits, issues and revenues in reduction thereof, then and in such event, Mortgagee agrees that Mortgagor's obligation to pay the total indebtedness to the Mortgagee hereunder shall be likewise reduced by an equivalent amount; such equivalent amount shall be deducted and handled in the same manner as handled by the First Mortgagee.

8. If the Mortgagee shall default in making any required payment of principal and interest under the First Mortgage, the Mortgagor shall have the right to advance the funds necessary to cure such default and all funds so advanced by Mortgagor shall be credited against the next installment(s) of interest and principal due under the note secured by this Mortgage.

9. Mortgagor and Mortgagee agree to promptly send to the other copies of any notices received by either of them, including copies of all notices of default, from the holder of the First Mortgage.

10. Receiver—If any event of default shall have occurred and be continuing, Mortgagee shall be entitled, as a matter of strict right and without regard to the value or occupancy of the security, to have a receiver appointed to enter upon and take possession of the premises, collect the rents and profits therefrom and apply the same as the court may direct, such receiver to have all the rights and powers permitted under the laws of Florida. * * *

On May 1, 1973, the sale to Cathedral Real Estate Co. (Cathedral), an assignee of Mr. Dick, was consummated in accordance with the contract of sale and purchase. The expenses incurred by the Goodman and Rossman trusts in the sale to Cathedral were $17,573.99 plus a broker's commission of $100,000 payable $25,000 at closing and the balance over a period of time. The closing statement showed that a cash payment, which, when added to the deposit, totaled the $600,000 downpayment called for under the sales contract, was made by Cathedral. A promissory note and mortgage were given by Cathedral to the trusts for the balance of the purchase price.[8] The fourth paragraph of the note provided as follows:

> The place of payment of this note shall only be a banking institution doing business in the State of Florida. The monthly payments as set forth in the Purchase Money Mortgage of even date between the parties hereto shall be made by Maker provided that Maker has the written commitment of the bank, as collecting agent of payees, that as long as Maker makes the payments due hereunder it will then make each monthly payment to the Metropolitan Life Insurance Company required to be made by Payees-Mortgagees.

In 1973, Mr. Goodman and Mr. Rossman received the $100,000 downpayment paid at closing from the sale of the apartments, exclusive of furniture and fixtures, to the trusts. The trusts received in 1973 the $600,000 downpayment at closing, and later in 1973, additional principal payments totaling $24,418. All of the payments to the trusts were deposited in the trust bank accounts. On the sale to the trusts, Mr. Goodman and Mr. Rossman made an election to report their gain, exclusive of furniture and fixtures, on the installment basis. On the sale to Cathedral, the trusts made an election to report their gain on the sale on the installment basis. If Mr. Goodman and Mr. Rossman had sold the apartments directly to Cathedral, they would have been eligible to elect to report their gain on the installment basis.

The sale of the apartments by Mr. Goodman and Mr. Rossman to the Goodman trusts and the Rossman trusts and the subsequent sale by the Goodman trusts and the Rossman trusts to Cathedral, as compared with a direct sale by Mr. Goodman

---

[8]The addendum to the mortgage from Cathedral to the trusts is identical to the one from the trusts to Mr. Goodman and Mr. Rossman except for the heading which identifies the mortgagor as Cathedral and the mortgagee as Mr. Goodman and Mr. Rossman, as trustees. See n. 7 *supra*.

and Mr. Rossman to Cathedral, neither altered the nature or amount of the income to be recognized by Mr. Goodman and Mr. Rossman, nor resulted in shifting income to lower bracket taxpayers. The sole impact of the use of two separate sales for Federal income tax purposes was upon the timing of recognition of income.

The EHA partnership reported its gain on the apartment buildings and improvements sale on an attachment to Schedule D of its U.S. Partnership Return of Income, for the calender year 1973, as follows:

*Part II, Schedule D—Long-term gain and losses*

| | | | |
|---|---|---|---|
| Selling price of apartments 5/8/73 | | | $3,750,000.00 |
| Cost of building—Phase I | $576,734.81 | | |
| Cost of building—Phase II | 385,308.50 | | |
| Cost of building—Phase III | 557,550.22 | $1,519,593.53 | |
| Less—accumulated depreciation: | | | |
| Phase I | 226,052.40 | | |
| Phase II | 146,777.17 | | |
| Phase III | 184,742.87 | 557,572.44 | |
| Book value | | 962,021.09 | |
| Add: | | | |
| Cost of land | 125,450.00 | | |
| Cost of sale | 14,121.60 | 139,571.60 | 1,101,592.69 |
| *Gross profit* | | | 2,648,407.31 |
| Gross profit % | | | 70.62 |

Taxpayer elects to report gain on installment basis

| | |
|---|---|
| Collections in year of sale | 100,000.00 |
| × gross profit % | 70.62 |
| *Realized gross profit (line 4—Part II—Schedule D)* | 70,620.00 |

Mr. Goodman and his wife reported their share of the partnership income on the apartment sale on an attachment to Schedule E of their Federal income tax return for the calender year 1973 in the amount of $35,310. Mr. Rossman and his wife also reported their share of the partnership income on the apartment sale on an attachment to Schedule E of their Federal income tax return for the calender year 1973 in the amount of $35,310.

Respondent in his notice of deficiency to Mr. Goodman and his wife increased their share of the EHA partnership long-term capital gain to $211,121.57 with the following explanation:

It is determined that your distributive share of long-term capital gain realized from the Executive House Apartments Partnership is $211,121.57, as computed on Exhibit A, in lieu of a reported gain of $35,310, and that income be increased by $87,906, computed as follows:

| | |
|---|---:|
| Long-term capital gain realized as determined | $211,121.57 |
| Long-term capital gain realized per return | 35,310.00 |
| Additional long-term capital gain realized | 175,811.57 |
| Less: section 1202 deduction | 87,905.79 |
| Additional taxable long-term capital gain | 87,905.78 |

\* \* \* \* \* \* \*

### Executive House Apartments Partnership

\* \* \* \* \* \* \*

### ADJUSTMENT TO LONG–TERM CAPITAL GAIN

| | |
|---|---:|
| Long-term capital gain realized shown on partnership return | $70,620.00 |
| Additional gain: | |
| (b) Installment sale | 351,623.15 |
| Corrected partnership long-term capital gain realized | 422,243.15 |

### EXPLANATION OF ADJUSTMENTS

\* \* \* \* \* \* \*

(b) It is determined: (1) that income from the sale of apartments to Cathedral Real Estate Company, Inc. is taxable to the partnership of William J. Goodman and Norman A. Rossman, Executive House Apartments; (2) that this action is necessary to prevent the evasion of taxes and to clearly reflect your income and the income of related taxpayers; and (3) that income be increased by $351,623.15, as computed below, under the authority of sections 61, 1001 and 482 of the Internal Revenue Code.

| | | |
|---|---:|---:|
| Selling price | | $3,850,000.00 |
| Less: | | |
| Reported cost of sale | $1,101,592.69 | |
| Broker's commissions | 100,000.00 | 1,201,592.69 |
| Gross profit | | 2,648,407.31 |
| Downpayment | | 600,000.00 |
| Payment received in: | | |
| June 1973 | | 3,419.33 |

| | |
|---|---|
| July 1973 | $3,442.13 |
| August 1973 | 3,465.08 |
| September 1973[9] | 3,488.18 |
| Total collections received in 1973 | 613,814.72 |
| Gross profit percentage: $2,648,407.31/$3,850,000.00 | 68.79 |
| Long-term capital gain realized in 1973 | 422,243.15 |
| Gain reported | 70,620.00 |
| Additional long-term gain realized | 351,623.15 |

### Distributive Share

| | Ordinary loss | Long-term capital gain |
|---|---|---|
| William J. Goodman (50%) | ($8,275.93) | $211,121.57 |

Respondent in his notice of deficiency to Mr. Rossman and his wife also increased their share of EHA partnership long-term capital gains by $211,121.57 with the same explanation as given to Mr. Goodman and his wife.

Barry S. Goodman, as the sole beneficiary of the Barry S. Goodman Trust, claimed, on Schedule D of his Federal income tax return for the calendar year 1973, a short-term capital loss of $3,461 from the trust sale of the apartments to Cathedral. Respondent, in his notice of deficiency, disallowed this claimed short-term capital loss with the following explanation:

With respect to the capital gain distribution of $24,478 reported by you as sole beneficiary of the Barry S. Goodman Trust, it is determined: (1) that the short-term capital loss of $3,461 reported by the Trust on the sale of Executive Apartments is not allowable because it has not been established that a deductible loss was sustained; (2) that your long-term capital gain distribution from the Trust be increased by $3,461; and (3) that taxable income be increased by $1,730, computed as follows:

| | |
|---|---|
| Increase in long-term capital gain distribution | $3,461 |
| Less: sec. 1202 deduction | 1,731 |
| Increase in taxable capital gain | 1,730 |

Lauren B. Goodman, Michael A. Goodman, and Paula Rossman each claimed a short-term capital loss of $3,461 from the sale by the trusts of the apartments in arriving at the $24,478 of long-term capital gain reported from their respective trusts on

---

[9]Why principal payments only through September 1973 were included is not shown in the record.

Schedule D of their respective returns for the calendar year 1973. In each instance, respondent issued a notice of deficiency disallowing the claimed short-term capital loss of $3,461 from the trust sale of the apartments to Cathedral with the same explanation as given to Barry S. Goodman.

Respondent, by amendment to his answer, claimed an increased deficiency from Mr. Goodman and his wife and from Mr. Rossman and his wife for the calendar year 1973 on the basis that the sale of the apartments by Mr. Goodman and Mr. Rossman was subject to the Metropolitan mortgage which was in excess of their basis in the apartments.[10]

## OPINION

Respondent takes the position that although in form, Mr. Goodman and Mr. Rossman made a sale to the trusts for their children, in substance, they sold the apartments to Cathedral. Respondent relies on the following statement in *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945):

The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using

---

[10]Respondent's amendment to answer contained the following allegations:

"(a) The sale of the Executive House Apartments by the petitioners, William J. Goodman and Norman A. Rossman, partners, whether to the six trusts as reported on the petitioners' returns for 1973 or to Cathedral Real Estate Company, Inc., as set forth by respondent in its statutory notice of deficiency, was subject to a mortgage to the Metropolitan Life Insurance Company in the amount of $1,533,356.00.

"(b) The basis of the petitioners, William J. Goodman and Norman A. Rossman, partners, in the Executive House Apartments as of the date of the sale was $1,101,593.00.

"(c) The mortgage to the Metropolitan Life Insurance Company exceeds the partnership's basis in the Executive House Apartments by $431,763.30, which amount is includible as a payment received in the year of sale by the partnership under Treas. Reg. sec. 1.453–4(c).

"(d) Petitioners William J. Goodman and Gloria Goodman by virtue of the above increased payment to the Goodman and Rossman partnership received an additional collection in the year of sale in the amount of $215,881.65 regardless of the Court's decision on whether the partnership sold the Executive House Apartments to six trusts which had been created for their children or to Cathedral Real Estate Company, Inc.

"(e) Petitioners Norman A. Rossman and Marilyn Rossman by virtue of the above increased payment to the Goodman and Rossman partnership received an additional collection in the year of sale in the amount of $215,881.65 regardless of the Court's decision on whether the partnership sold the Executive House Apartments to six trusts which had been created for their children or to Cathedral Real Estate Company, Inc."

the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. [Fn. ref. omitted.]

Whether the form of a transaction differs from its substance for purposes of Federal taxation is a fact to be decided upon consideration of the entire transaction. *United States v. Cumberland Public Service Co.,* 338 U.S. 451, 456 (1950). Respondent argues that here Mr. Rossman and Mr. Goodman constructively received the income of $600,000 received by the trusts from Cathedral. Respondent contends that the trusts were mere conduits to pass these funds to Mr. Goodman and Mr. Rossman.

Petitioners argue that the two sales were separate and independent transactions for Federal income tax purposes and that Mr. Goodman and Mr. Rossman did not either actually or constructively receive, or in any way benefit from, the proceeds of the sale by the trusts to Cathedral.

The record shows that the formality of a sale by Messrs. Goodman and Rossman to the trusts was carried through. It also shows that no contract for sale by the trusts to Cathedral was entered into prior to the time that the trusts had purchased the property from Messrs. Goodman and Rossman. In other words, at the time Messrs. Goodman and Rossman sold the property to the trusts, the trusts could have kept the property since they were under no obligation to make a sale of it. The record also shows that the sale of the apartments by Mr. Goodman and Mr. Rossman to the trusts, and the sale by the trusts to Cathedral, as compared to a direct sale by Messrs. Goodman and Rossman to Cathedral, did not alter the nature or amount of the income to be recognized by Mr. Goodman and Mr. Rossman and did not result in shifting income to a lower bracket taxpayer. The sole impact of the use of two separate sales for Federal income tax purposes was in the timing of recognition of income.[11]

---

[11]The parties in their Stipulation of Fact No. 38 stipulated as follows:

"The sale of the Executive House Apartments by Goodman and Rossman to the Goodman Trusts and Rossman Trusts and the subsequent sale by the Goodman Trusts and the Rossman Trusts to Cathedral, as compared with a direct sale by Goodman and Rossman to Cathedral, neither altered the nature or amount of the income to be recognized by Goodman and Rossman, nor resulted in shifting income to lower bracket taxpayers. The sole impact of the use of two separate sales for federal income tax purposes was upon the timing of recognition of income."

It is upon this stipulation that we based our finding that a direct sale by Messrs. Goodman and Rossman to Cathedral would not have altered the nature or amount of the income to be

In this case, the trusts received an initial payment of $600,000, whereas they paid to Messrs. Goodman and Rossman a downpayment of only $100,000. Also, the trusts stood to profit from the transaction not only through whatever higher interest they might be able to obtain on the additional $500,000 than the rate being paid to Messrs. Goodman and Rossman, but also because of the trusts' contract with Cathedral providing for periodic payments on principal which could be reinvested by the trusts and payment of 8-percent interest on the unpaid balance as compared to the 6.65-percent interest the trusts were paying to Messrs. Goodman and Rossman.

The only distinctions that respondent attempts to make in the factual situation in the instant case from those which existed in the cases of *Rushing v. Commissioner*, 52 T.C. 888 (1969), affd. 441 F.2d 593 (5th Cir. 1971); *Pityo v. Commissioner*, 70 T.C. 225 (1978); *Roberts v. Commissioner*, 71 T.C. 311 (1978), on appeal (9th Cir., Apr. 27, 1979); *Weaver v. Commissioner*, 71 T.C. 443 (1978), on appeal (6th Cir., June 22, 1979); and other similar cases, are (1) that here, Messrs. Goodman and Rossman would have been entitled to the use of the installment sale basis under section 453 had they sold directly to Cathedral, and (2) that since Mr. Goodman was trustee of the Goodman trusts and Mr. Rossman of the Rossman trusts, the sales were not to independent entities as they were in the cases above cited where the trustee was either an institution or an individual other than the seller of the property.

Respondent argues that our holdings in *Rushing, Pityo, Roberts,* and *Weaver* are wrong and that we should reconsider those cases. Respondent states that the instant case demonstrates that the holdings in those cases can lead to abuse by sellers of property to trusts for the benefit of their children. Our holding in the *Rushing* case was affirmed on appeal to the Fifth

recognized by them, but merely the timing of recognition of income. We have some difficulty with this stipulation in view of the higher interest rate paid by Cathedral to the trusts than the interest rate paid by the trusts to Messrs. Goodman and Rossman. However, since in our view petitioners were entitled to rely on a stipulation entered into by the parties, we have accepted the stipulated fact and will make our decision based on this stipulated fact's being a true fact. Presumably, absent this stipulation, evidence would have been introduced to enable us to tell exactly whether in fact the two sales rather than a direct sale to Cathedral by Messr. Goodman and Rossman resulted in any difference in tax to Mr. Goodman and Mr. Rossman other than the time when the tax was paid.

Circuit to which an appeal in the instant case would lie. The *Pityo* case was not appealed to the Fifth Circuit, and neither the Sixth Circuit nor the Ninth Circuit has decided the issue on appeal. Under these circumstances, we do not consider it appropriate to reconsider our position in the *Rushing, Pityo, Roberts,* and *Weaver* cases. We will, therefore, consider only the distinctions respondent argues exist in those cases and the instant case.

The sale to Cathedral had less than 30 percent of the selling price paid in the first year, and had Mr. Goodman and Mr. Rossman sold the apartments directly to Cathedral, they could have used the installment method of reporting the gain. However, in our view, this fact is immaterial to the determination to be reached in this case. Whether the entire proceeds of the sale would have been received by the seller in the year of the sale, or only $500,000 additional proceeds if one rather than two sales had occurred, is immaterial in determining the bona fides of the two sales.[12] It is probably for this reason that respondent does not stress in his argument the difference in the type of sale made by the trusts in this case from the type made in other cases dealing with sales by taxpayers to trusts for their children followed by sales by the trusts of the property sold to them. Respondent's main argument is that in analyzing the types of arrangements made in the *Rushing, Pityo, Roberts, Weaver,* and similar cases, the fact has been stressed that the initial seller of the property was not in control of the proceeds of the sale by the trusts and did not receive any benefit from the proceeds of that sale. Respondent argues here that Mr. Goodman and Mr. Rossman were in control of the proceeds of the second sale because they themselves were the trustees of the trusts that made the second sale. Respondent argues (1) that as trustees of

---

[12]Mr. Goodman testified that he and Mr. Rossman received a benefit from making the sale to the trusts with a minimal downpayment since the interest they would receive over a 20-year period was approximately $70,000 a year more than their required payments on the mortgage on the property to Metropolitan. They were each left with an assured $35,000 yearly income during the 20-year period and with a receipt by the two of them of an amount in excess of $3.6 million when they would probably be retired of semiretired. Whether in fact this method of receiving payment would be beneficial to Mr. Goodman and Mr. Rossman would depend on many factors which could not be known with definiteness at the time of the sale. However, the claimed advantage by the sellers in *Rushing v. Commissioner,* 52 T.C. 888 (1969), affd. 441 F.2d 593 (5th Cir. 1971); *Roberts v. Commissioner,* 71 T.C. 311 (1978), on appeal (9th Cir., Apr. 27, 1979), and most of the other cases involving an issue similar to that here involved was very little different from the advantages to themselves claimed by Messrs. Goodman and Rossman.

the trusts, Messrs. Goodman and Rossman had the power to utilize the proceeds in whatever investment capacity best suited their purpose; (2) that a transaction between trustees in their individual capacity and the trusts of which they are trustees clearly shows disloyalty on the part of the fiduciaries; and (3) that the fiduciaries did not feel restrained in their management of the trusts by the laws of the State governing the trusts.

Certainly under the broad powers granted to Mr. Goodman as trustee of the Goodman trusts and Mr. Rossman as trustee of the Rossman trusts, each of them had the power to utilize the proceeds received by the trusts on the sale of the apartment property as in their judgment they deemed most appropriate. However, this power was strictly limited by the trust agreement, portions of which we have set forth in our findings. The powers granted to the trustees were to be exercised in a fiduciary capacity "solely in the interest of the beneficiaries." The problem here, therefore, is whether the fact that Mr. Goodman and Mr. Rossman as individuals sold property owned by them to the trusts of which they were trustees demonstrates a disloyalty on their part as fiduciaries to such an extent that the sale should be for this reason alone considered not to be bona fide.

Each trust agreement involved in this case, in paragraph 7(a) specifically authorized the trustee to enter into transactions as trustee with himself as an individual or as a trustee of other trusts if in his judgment this was the "best course to pursue in the interest of the Trust and the beneficiaries." We are therefore dealing here with a trust that specifically authorized the trustees to deal with themselves as individuals. As respondent points out, in G. Bogert, Trusts and Trustees, sec. 543(E), p. 272 (2d rev. ed. 1978), the statement is made that "One of the clearest cases of disloyalty on the part of a fiduciary is that where the trustee or other fiduciary sells to himself as trustee an asset which he owns in his individual or personal capacity." The reason for this is stated to be that as a seller a person's interest is to obtain the highest price feasible for property, and as a purchaser it is to obtain the lowest price so that the "conflict of interest is apparent." However, further in this same paragraph appears the following statement (p. 275): "In several states there are statutes either prohibiting the trustee from selling his individual property to the trust, or requiring that the sale be

authorized in the trust instrument or approved by the court or the beneficiaries."[13]

In 2 A. Scott, Trusts, sec. 170.12, pp. 1326–1330 (3d ed. 1967), the following appears:

SEC. 170.12. Sale of trustee's individual property to himself as trustee. Just as it is improper for a trustee to sell trust property to himself individually, so conversely it is improper for him to sell his individual property to himself as trustee. * * *

Where a trustee sells his individual property to the trust, the beneficiaries can compel him to repay the amount of the purchase money with interest. If he does so, he is entitled to receive back the property together with any income received therefrom while it was held in the trust. * * *

*     *     *     *     *     *     *

By the terms of the trust the trustee may be permitted to purchase property owned by him individually. Such a provision is effective unless the trustee acts in bad faith in making the purchase. [Fn. refs. omitted.]

Respondent also points out that there is testimony in the record that Messrs. Goodman and Rossman have, through the years they have been trustees for the trusts, entered into a number of transactions in their personal capacity with themselves as trustees. The record does show that Mr. Goodman and Mr. Rossman had, previous to the transactions here involved, entered into transactions in their individual capacities with themselves as trustees, but also shows that these transactions had been beneficial to the trusts.

Were it not for the fact that there are specific provisions in

---

[13]Prior to 1974, Florida had no law prohibiting sales by a trustee in his individual capacity to himself as trustee. However, in an early case, *Saunders v. Richard*, 35 Fla. 28, 16 So. 679 (1895), the Supreme Court of Florida stated in this respect (p. 685):

"The law looks with extreme jealousy upon all purchases of the trust estate by the trustee. Such purchases are always voidable, upon proper proceedings taken by the cestui que trust. * * *"

In the more recent case of *Crawford v. Crawford*, 129 Fla. 746, 176 So. 838, 841 (1937), the Supreme Court stated with respect to a trustee that—

"he could not assume as an individual and in his own right a position antagonistic to that of his cestuis que trustent. That a trustee cannot so act is too elementary to require citation of authority.

"It, therefore, follows that * * * he cannot proceed in partition upon a title to an undivided interest acquired while he occupied the status of such trustee and thereby adversely affect the right of the remaining cestuis que trustent to redeem."

However, nothing that has been called to our attention or that we have found in the Florida law prohibited a trustee from selling property, which he individually owned, to himself as trustee where such action was permitted by the trust instrument, and the trustee's action with respect to the trust's purchase of the property was in the best interest of the trust.

the trust instrument here involved permitting the trustees to enter into transactions in their individual capacities with themselves as trustees, respondent might have some point as to the bona fides of the transaction here involved. However, under the trust instrument here involved, Mr. Goodman and Mr. Rossman were permitted to sell property held by them as individuals to themselves as trustees. The record shows no bad faith by the trustees in making the purchase from themselves in their individual capacities but rather shows that the advantage in the entire transaction lay with the trusts. In our view, therefore, under the particular facts in this case there is no merit to respondent's position that the sale by Mr. Goodman and Mr. Rossman as individuals to themselves as trustees shows a disloyalty on their part as fiduciaries and that they did not feel restrained in the management of the trusts by the laws of Florida governing actions of trustees. In fact, the record as a whole clearly shows that Mr. Goodman and Mr. Rossman as trustees for the trusts acted uniformly, as well as in this instance, in the best interest of the trusts.

Respondent argues that the fact that Messrs. Goodman and Rossman negotiated the second sale shows that they were in control of that sale and that in his view, the fact that they made clear in the negotiations that they were acting as trustees for the trusts did not change the situation. Respondent argues that because Mr. Goodman and Mr. Rossman were the trustees of the trusts that purchased the apartments, this case is governed by *Griffiths v. Helvering*, 308 U.S. 355 (1939).

In the *Griffiths* case, the Supreme Court held that where a taxpayer sold property to his controlled corporation, and the controlled corporation sold the property to a third party, the substance of the transaction was a sale by the taxpayer to the third party. In the *Griffiths* case, the Supreme Court described the transaction as follows at page 357:

Griffiths was to re-acquire the shares, convey them to a corporation newly created for the purpose of furthering the scheme and wholly controlled by Griffiths, which in turn was to transfer the stock back to Lay for $100,000 to be paid by him, and that sum was to be paid over by the corporation to Griffiths in annual installments for forty years, with interest on the deferred payments. The essentials of this scheme were carried out. Its purpose—to disguise by intervening elaborations what in fact was a rescission of the original purchase by Griffiths for $100,000—was made more manifest by these facts: Griffiths personally re-acquired and transferred the shares to Lay without revealing the

existence of the new corporation, gave Lay a personal release of all claims against him, and personally received from Lay the $100,000 which he then turned over to the corporation. [Fn. ref. omitted.]

After reciting the facts, the Court in the *Griffiths* case stated at pages 357–358:

> We cannot too often reiterate that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed— the actual benefit for which the tax is paid." * * * And it makes no difference that such "command" may be exercised through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency. * * * "A given result at the end of a straight path," this Court said in *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613 [58 S.Ct. 393, 395, 82 L.Ed. 474], "is not made a different result because reached by following a devious path." * * *

Clearly, the situation in the instant case does not fall within the factual pattern of the *Griffiths* case. In the instant case, the trusts had been established for many years prior to the transaction here involved. The total fair market value of the six trusts was in excess of $3,600,000 at the time of the sale of the apartments to the trusts. The sale to the trusts clearly placed on the trusts, as entities, the liability to pay the agreed sums to Mr. Goodman and Mr. Rossman. The transaction was an advantageous one for the trusts because of the available funds the trusts would have over a period of years for investments at a higher rate of return than they were paying on the purchase from Mr. Goodman and Mr. Rossman. Here, as in *Roberts v. Commissioner, supra* at 324, a transfer of assets was made by Mr. Goodman and Mr. Rossman to the trusts for their children with the expectation of "the subsequent investment thereof at a return higher than the interest rate on the notes." The trusts in the instant case were separate entities from Mr. Goodman and Mr. Rossman and were entities with substantial assets.

As we pointed out in *Roberts v. Commissioner, supra* at page 322, "The *Rushing* test prohibits the application of the installment method of reporting by a grantor who has sold property to a trust if (1) he has control of, or (2) the economic benefit of the proceeds."

It is clear in the instant case that the trusts and not Mr. Goodman and Mr. Rossman had the economic benefit of the proceeds of the sale to Cathedral. Here, not only were the trusts irrevocable as they were in the *Roberts* case, but they had been set up by persons other than Mr. Goodman and Mr. Rossman

although they were trusts for the benefit of the Goodman and Rossman children. We are therefore left with the narrow question of whether facts that otherwise would fall squarely within the *Rushing, Pityo, Roberts*, and similar cases are brought outside those cases because Mr. Goodman and Mr. Rossman sold property to trusts of which they were trustees.

The record shows that the accountants and attorneys advising Mr. Goodman and Mr. Rossman questioned whether the sale should be made to trusts of which the sellers were trustees and advised Mr. Goodman and Mr. Rossman to substitute a bank as trustee prior to selling the property to the trusts. Mr. Goodman and Mr. Rossman were unwilling to make such a substitution since the major portions of the assets of the trusts were in real property. They felt they were much better equipped from their long experience than a bank trustee to administer the real property assets owned by the trusts. Over a period of 12 to 13 years, they had been able, starting with an initial amount of $15,000 ($2,500 per trust), to handle the investments of the trusts in such a manner that the book value of each of the trusts in early 1973 was approximately $93,000, and the fair market value of each of the trusts' assets was in excess of $600,000. In fact, there is testimony in the record of some subsequent transactions with respect to trust property which also had been quite successful. It was the position of Messrs. Goodman and Rossman that they were independent trustees since they were specifically governed by the provisions of the trust instrument and the laws of the State of Florida requiring all their actions with respect to the trusts to be solely for the best interests of the trusts. The record shows that all actions they took with respect to the trusts' assets were taken solely for the best interest of the trusts.

In the other cases dealing with a factual situation similar to that here involved, we have stressed the independence of the trustee of the trusts to which the sale was made. In *Pityo v. Commissioner, supra* at 238, we stated:

No doubt petitioner expected the trustee to sell the Arvin stock and invest the proceeds in mutual fund shares, and no doubt officials of the bank, as trustee, planned to do so. But the three trusts were created and they received the gift of 2,500 shares and bought the 21,500 shares of Arvin stock free of any precommitment for resale to any third party and before any portion of that stock was sold on the open market. Upon acquiring that stock, the trustee became subject to Florida law which imposes a duty of exclusive allegiance to the trust beneficiaries. *Investors Syndicate v. City of Indian Rocks Beach,*

*Florida,* 434 F.2d 871, 878–879 (5th Cir. 1970); *Saunders v. Richard,* 35 Fla. 28, 16 So. 679 (1895); *In Re Will of Wickman,* 289 So.2d 788 (Fla. App. 1974). See also *Skemp v. Commissioner,* 168 F.2d 598 (7th Cir. 1948), revg. 8 T.C. 415 (1947). The legal responsibility for making the decision to sell the Arvin stock was that of the trustee, not petitioner. In these circumstances the prior informal understanding between petitioner and the intended trustee is not decisive. See *Brown v. Commissioner,* 180 F.2d 926, 929 (3d Cir. 1950), revg. 12 T.C. 1095 (1949), cert. denied 340 U.S. 814 (1950); *Oakes v. Commissioner,* 44 T.C. 524, 529 (1965); *Felix v. Commissioner,* 21 T.C. 794, 804 (1954).

In *Roberts v. Commissioner,* supra at 322–323, we stated with respect to the same problem of independence of the trustees as follows:

Respondent does not question that the trust was irrevocable nor that it was a valid and distinct entity under local law. Petitioner retained no right to alter or amend the trust agreement or to remove the trustees. The trustees were petitioner's accountant and his brother. While independence must be scrutinized when there exists a close relationship between the parties (cf. *Wrenn v. Commissioner,* 67 T.C. 576 (1976)), petitioner has provided sufficient proof that the trustees herein acted independently. One trustee, the accountant, primarily kept books for the trust and served as a backboard on which the second trustee could play off his investment ideas. With respect to the second trustee, petitioner's older brother, we find that it was the elder brother who influenced petitioner. The brother not only instigated the various sales from petitioner to the trust, but also the formation of the trust itself. This brother had been petitioner's investment adviser for years.

Petitioner fully expected that the stock would be resold. He agreed to settle for the net selling price of the stock as of the day of transfer as set by the American and the Pacific Coast Stock Exchanges. However, prearrangement of a selling price based on a market value that cannot be influenced by either the purchaser or seller is a normal practice sanctioned by the Uniform Commercial Code. U.C.C. sec. 2–201 * * *

The record in the instant case shows that Mr. Goodman and Mr. Rossman as trustees were in no way obligated to make the sale to Cathedral but that in making that sale, they acted in the best interest of the trusts. In fact, the trusts stood to obtain substantial benefits from the sale over a period of years. Both Messrs. Goodman and Rossman recognized, and had through the years understood, their fiduciary duties to the trusts. The trusts were independent entities. Relying on *Pityo* and the cases cited therein, Mr. Goodman and Mr. Rossman argue that even though they as trustees had the power to cause the trusts to sell or not to sell the apartments, that power was tightly circumscribed by the fiduciary obligations under which that power was exercised, and that the decision was made solely with the benefit of the

trusts in mind. In a number of factual situations differing from the facts in the instant case, we have refused to hold a transaction between an individual and a trust of which he was the trustee without substance solely on that ground.

In cases involving assignment by an individual of property to a charitable organization of which he was a trustee, we have held the fact of the relationship between the transferor and the charity not to be controlling. In *Palmer v. Commissioner*, 62 T.C. 684, 693 (1974), we stated, in holding a gift of stock in a corporation where redemption of the stock was imminent to be a valid gift of the stock and not a gift of the proceeds of the redemption:

It is true that the petitioner controlled the foundation. However, the foundation was a charitable organization that was organized for certain specific purposes. Under Iowa law, the petitioner was subject to the responsibilities and duties of a fiduciary when he acted as director and trustee of the foundation * * *

In *S. C. Johnson & Son, Inc. v. Commissioner*, 63 T.C. 778, 789 (1975), we held a gift of contracts for sales of British pounds which had increased in value to a fund which was controlled by the taxpayer's officers to be a gift of the contracts and not of the proceeds from the sale of the contracts. See also *Buehner v. Commissioner*, 65 T.C. 723 (1976). In *Furman v. Commissioner*, 45 T.C. 360, 366 (1966), affd. 381 F.2d 22 (5th Cir. 1967), in holding that property conveyed to 10-year trusts for the taxpayer's minor children, of which the taxpayer was trustee, and leased back to the taxpayer lacked economic reality, we stated "Our decision is not premised upon the retention of dominion and control over the trust by Irvine, but on the absence of economic reality."

In *Van Zandt v. Commissioner*, 341 F.2d 440 (5th Cir. 1965), affg. 40 T.C. 824 (1963), in holding that rent was not deductible by a physician who transferred the building he used as an office to trusts for the benefit of his children, of which he was trustee, and leased the building back, the Court made clear that its conclusion did not rest solely on the fact that the transferee of the property was the trustee of the trusts, but rather on the short term of the trust, reversion to the settlors, predetermination of the right to possession of the property, and the like.

Considering our holdings in a number of other cases, we conclude that the fact that a seller of property is the trustee of

the trusts to which the property is sold, standing alone, does not cause the sale to lack substance or bona fides, or the seller to constructively receive the income from the sale received by the trusts. The crucial fact is whether the trustee was acting solely as trustee and in the best interests of the trusts in making the purchase and sale of the property.

In our view, under the facts here present, Mr. Goodman and Mr. Rossman did not have control over the proceeds of the sale or control over making the sale to Cathedral except in their capacity as trustees, which was a capacity distinct and apart from their capacity as individual sellers of the property.

The trusts, in purchasing the property from petitioners, took substantial risks of their own funds with the hope of substantial benefits. There was no preexisting contract or agreement made by Mr. Goodman and Mr. Rossman in their individual capacities which was assigned to the trust, but rather, the sale was made by them as trustees. In our view, this case falls within the *Rushing, Pityo, Roberts,* and *Weaver* cases, even though Messrs. Goodman and Rossman remained as trustees of the trusts, and is distinguishable from *Wrenn v. Commissioner,* 67 T.C. 576 (1976), where a sale between a husband and wife was held to lack substance for tax purposes because there existed no substantive purpose for the transaction other than tax avoidance, and *Lustgarten v. Commissioner,* 71 T.C. 303 (1978), which involved an installment sale of stock by a taxpayer to his son, with the assets in which the proceeds from the resale of the stock were invested placed in escrow to assure the installment payments to the taxpayer. Other than the sellers of the property being the trustees of the trusts to which the property was sold, this case is indistinguishable from the *Rushing, Pityo, Roberts,* and *Weaver* cases. We therefore hold that, in substance as well as form, Mr. Goodman and Mr. Rossman sold the apartments to the Goodman and Rossman trusts and not to Cathedral, and that Mr. Goodman and Mr. Rossman did not constructively receive the payments made by Cathedral to the trusts.

The second issue is whether the trusts "assumed" the Metropolitan mortgage on the apartments or took the apartments "subject to" the mortgage so that the excess of the mortgage over the partnership's basis is included in the first-year pay-

710

ments to Messrs. Goodman and Rossman under section 1.453–4(c), Income Tax Regs.[14]

Section 453(a) provides that certain sellers of personal property on the installment plan may return as income from such sales a percentage of the payments actually received in a tax year. That percentage is the gross profit on the sale over the total contract price. This method of reporting income is extended to sales of real property under section 453(b) if the payments in the first taxable year of sale do not exceed 30 percent of the selling price.[15]

Section 1.453–4(c), Income Tax Regs., provides as follows with respect to the treatment of the sale of mortgaged property in an installment sale:

> (c) *Determination of "selling price".* In the sale of mortgaged property the

---

[14]The second issue was raised for the first time just prior to trial in an amendment to answer. Since it is a new matter which increases the deficiency, the burden of proof as to the second issue is on respondent. *Estate of Tony Cordeiro v. Commissioner,* 51 T.C. 195, 203 (1968); Rule 142(a), Tax Court Rules of Practice and Procedure.

[15]Sec. 453(a) and, in pertinent part, (b) read as follows:

(a) DEALERS IN PERSONAL PROPERTY.—

(1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

(2) TOTAL CONTRACT PRICE.—For purposes of paragraph (1), the total contract price of all sales of personal property on the installment plan includes the amount of carrying charges or interest which is determined with respect to such sales and is added on the books of account of the seller to the established cash selling price of such property. This paragraph shall not apply with respect to sales of personal property under a revolving credit type plan or with respect to sales or other dispositions of property the income from which is, under subsection (b), returned on the basis and in the manner prescribed in paragraph (1).

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply—

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—

(i) there are no payments, or

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 per cent of the selling price.

amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the "selling price"; and for the purpose of determining the payments and the total contract price as those terms are used in section 453, and sections 1.453–1 through 1.453–7, the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property. The term "payments" does not include amounts received by the vendor in the year of sale from the disposition to a third person of notes given by the vendee as part of the purchase price which are due and payable in subsequent years. Commissions and other selling expenses paid or incurred by the vendor shall not reduce the amount of the payments, the total contract price, or the selling price.

In *Burnet v. S. & L. Building Corp.*, 288 U.S. 406 (1933), the Supreme Court upheld the validity of a prior regulation which in substance was the same as this regulation and allowed the Commissioner to include as payments in the year of sale the excess of the assumed mortgage over the seller's depreciated basis of the real property. The Court in *S. & L. Building Corp.* noted that installment sales encumbered by liens gave rise to complications which Congress could not easily foresee and found that Congress therefore entrusted to the Commissioner wide discretion as to the details of installment reporting upon the sale of encumbered property. *Burnet v. S. & L. Building Corp., supra* at 414.

In *Stonecrest Corp. v. Commissioner*, 24 T.C. 659 (1955), however, we rejected the Commissioner's interpretation of section 1.453–4(c), Income Tax Regs., which would have extended its application to every sale of encumbered property. Instead, we held that the purchasers in that case had neither assumed the preexisting mortgages nor taken the properties subject to the mortgages. We decided that the expressions "assumption of a mortgage" and "subject to a mortgage" as used in the regulations should be given the meaning customarily attributed to them as related to the transfer of mortgaged property. We then explained those customary meanings as follows:

Taking property subject to a mortgage means that the buyer pays the seller for the latter's redemption interest, i.e., the difference between the amount of the mortgage debt and the total amount for which the property is being sold, but the buyer does not assume a personal obligation to pay the mortgage debt. The buyer agrees that as between him and the seller, the latter has no obligation to satisfy the mortgage debt, and that the debt is to be satisfied out of the property. Although he is not obliged to, the buyer will ordinarily make the payments on the mortgage debt in order to protect his interest in the property.

Where a buyer assumes a mortgage on property, he pays the seller for the latter's redemption interest, and in addition promises the seller to pay off the mortgage debt. This promise of the buyer can ordinarily be enforced by the mortgagee. 5 Tiffany, The Law of Real Property, secs. 1435, 1436 (3d ed. 1939); IV American Law of Property, secs. 16.125, 16.127, 16.128–16.132 (1952).

\*    \*    \*    \*    \*    \*    \*

In this case there was no reduction in selling price because of the mortgage and it seems clear that the seller was intended to pay the mortgage debt out of the proceeds of the sale. By his interpretation respondent would extend the application of the regulation to every sale of property that has a mortgage on it. While in a sense every sale of mortgaged property is subject to a mortgage since the property remains liable to have the mortgage debt satisfied from it, we think the expression was used in the regulation in its customary meaning, to define the obligations of the parties to a sale of property with respect to the mortgage debt. See Tiffany, *supra*, sec. 1435. [*Stonecrest Corp. v. Commissioner, supra* at 666, 668.]

In a case following *Stonecrest, Estate of Lamberth v. Commissioner*, 31 T.C. 302 (1958), we further explained that the regulation was not intended to apply to every sale of encumbered property. Rather, it was to apply to transactions in which only a portion of the sale price was paid directly to the seller by the purchaser, and the remainder was paid by the purchaser directly to the mortgagee.[16] *Estate of Lamberth v. Commissioner, supra* at 315. See also *United Pacific Corp. v. Commissioner*, 39 T.C. 721 (1963).

In *Waldrep v. Commissioner*, 52 T.C. 640 (1969), affd. 428 F.2d 1216 (5th Cir. 1970), we noted that a mortgage could be assumed despite the lack of formal agreement to assume in the documents executed in connection with the sale, and held that under the facts and circumstances of the transaction, the intent of the parties was for the buyer to assume the mortgage. In *Voight v. Commissioner*, 68 T.C. 99, 114 (1977), affd. per curiam 614 F.2d 94 (5th Cir. 1980), we pointed out that, not the form, but the substance of the entire transaction should be considered in determining whether a mortgage had been assumed by the buyer stating:

---

[16]Respondent argues that *Stonecrest Corp. v. Commissioner*, 24 T.C. 659 (1955), and the cases which followed were all involving contracts for deeds and not wraparound mortgages with immediate transfer of title. Petitioners argue that under the test set forth in *Stonecrest*, such a distinction is without significance. Since we find for respondent without regard to the difference, we need not, and do not, decide whether the wraparound mortgage with immediate transfer of title should be treated differently from the contract for deed.

While the transaction before this Court was not an assumption in form, we have found that all elements of an assumption, as that term is customarily understood, were present either in the express agreements or implied understandings of the parties. The sellers had a right to receive only the amount of their equity or redemption interest, the buyer was obligated to both the seller and the mortgagee to pay the mortgage payments, and the mortgage payments were in fact made directly to the mortgagee by the buyer. On this basis, Madison assumed the First Federal mortgages within the meaning of respondent's regulation. [Fn. ref. omitted.] * * *

In the instant case, it is necessary to consider all the facts and the import of all the documents executed by the parties in order to determine whether all the elements present in an assumption of a mortgage, or the taking of property subject to a mortgage, are present. Petitioners argue that the mortgage on the sale to the trusts was a wraparound mortgage under which the partners remained solely responsible for the discharge of the Metropolitan mortgage. Furthermore, they argue that the trusts were required to pay the partnership the entire purchase price without reduction for the Metropolian mortgage.

Respondent's position is that in light of all the facts and circumstances of the transaction, in substance, the trusts either assumed the Metropolitan Mortgage or took the apartments subject to the Metropolitan mortgage. He argues that, in substance, only part of the selling price could be paid directly to the seller, the partnership, and that the remainder had to be paid to the mortgagee, Metropolitan.

The facts in the instant case are not comparable to the facts in the *Stonecrest* and *Lamberth* cases in each of which the seller of the property retained the full responsibility for the payment of the mortgage until such time as the property was deeded to the buyer and the remaining balance on the mortgage assumed. Certainly, in those cases, the buyer paid to the seller an amount equal to the mortgage payments plus an additional amount to pay off the contract price on the house. However, this amount went into the seller's general funds. The obligation to make the mortgage payments rested solely on the seller. Likewise, the facts in this case differ from those in *Waldrep* and *Voight* in both of which the payments on the preexisting mortgage were made directly by the purchasers of the property to the mortgagee. Here, under the contract between the parties, the payments by the trusts were to be made "at a banking institution, which shall deduct from each payment received by it the amount

required to pay principal and interest installments of the various Metropolitan mortgages and remit the same to such Mortgagee." The note given by the trusts to Mr. Goodman and Mr. Rossman provided for payment by the trusts of the mortgage notes provided the trusts had "the written commitment of the bank, as collecting agent of payees, that as long as Maker [the trusts] makes the payments due hereunder it will then make each monthly payment to the Metropolitan Life Insurance Company required to be made by Payees-Mortgagees."

Petitioner stresses the statement in the note referring to the bank "as collecting agent of payees." However, in our view, since the bank was obligated to make the payments on the Metropolitan mortgages from the funds collected from the trusts, the bank was in fact the collecting agent of "the payees" only as to the balance of the payments. The bank was in substance the conduit of the payments due on the Metropolitan mortgages from the trusts to the mortgagee. Therefore, in substance, this case more nearly factually resembles the *Waldrep* and *Voight* cases than the *Stonecrest* and *Lamberth* cases.

Under the facts here present, we find that in substance "only part of the total selling price would be paid directly to the seller by the purchaser, the remaining part being paid by the buyer directly to the mortgagee."[17] *Estate of Lamberth v. Commissioner, supra* at 315. We therefore hold that the trusts took the apartment property subject to the Metropolitan mortgage.[18]

On reply brief, petitioners object to respondent's recalculation of the gross percentage of profit to be applied to actual payments. In respondent's statutory notice of deficiency, the gross percentage of profit was calculated as 68.79 percent, and on brief, respondent found it to be 96.79 percent. Petitioners argue that respondent is barred from increasing the percentage

---

[17]See Comment, "The Wrap-around Mortgage: A Critical Inquiry," 21 U.C.L.A. L. Rev. 1529, 1559 (1974), wherein it was suggested such collection agreements would create a sale subject to a mortgage.

[18]Petitioners also argue that it is significant that, if the payments were not received by the partners, they were personally liable to Metropolitan. This is probably the situation in many situations where property is taken "subject to a mortgage" and therefore, if true, would not effect our conclusion. However, the parties in this case stipulated that, because the consolidation, modification, and spreading agreement signed in conjunction with the Metropolitan mortgage declared that the holder was not entitled to a deficiency judgment, there was a substantial question as to the personal liability of the partners on the Metropolitan mortgage.

because such an increase is a new issue raised for the first time on brief. We do not agree. The gross percentage of profit figure is related to whether the property was sold subject to a mortgage in excess of the seller's basis in the property. Certainly new issues cannot be raised on brief. However, the gross profit percentage is not a new issue but merely a computation to be derived from our decision. The proper computation should be made under Rule 155 on the basis of our holdings herein.

*Decision will be entered under Rule 155.*