WILLIAM F. LICHTMAN and SYLVIA LICHTMAN, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Lichtman v. Commissioner
Docket Nos. 14209-78, 14250-78, 7981-80.
United States Tax Court
T.C. Memo 1982-630; 1982 Tax Ct. Memo LEXIS 116; 44 T.C.M. (CCH) 1536; T.C.M. (RIA) 82630; October 27, 1982. Charles W. Tuckman, for the petitioners Michael N. Gendelman, *117 for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes for 1974 and 1975 as follows: Docket
Deficiency
Number
Petitioners
1974
1975
14209-78
William F. Lichtman and
$15,947
$18,222
Sylvia Lichtman
14250-78
D. Daniel Golden and
$ 3,546
$ 2,316
Jerrol E. Golden
7981-80
Harry S. Dvorsky and
$12,940
$ 8,890
Isobel Dvorsky
In an amended answer, respondent alleges liability for deficiencies in docket Nos. 14209-78 and 14250-78 as follows: Deficiency
Petitioners
1974
1975
William F. Lichtman and Sylvia Lichtman [1]
$23,371
$8,569
D. Daniel Golden and Jerrol E. Golden [1]
$ 4,989
$ 895
After various concessions by the parties, the primary issues remaining for decision are: 1. Whether petitioner sold an apartment complex on January 1, 1974, "subject to" certain encumbrances; 2. The amounts of the interest expense deductions, *118 if any, to which petitioners are entitled for 1974 and 1975 based on interest payments made by the purchaser of the apartment complex with respect to the encumbrances; and 3. The amount of the interest income, if any, received by petitioners during 1974 and 1975 in connection with the installment sale of the apartment complex. FINDINGS OF FACT Each of the couples who are petitioners in these consolidated cases--petitioners William F. Lichtman and Sylvia Lichtman (hereinafter referred to jointly as Lichtman), petitioners D. Daniel Golden and Jerrol E. Golden (Golden), and petitioners Harry S. Dvorsky and Isobel Dvorsky (Dvorsky)--timely filed joint Federal income tax returns for 1974, 1975, and 1976 with the Internal Revenue Service Center, Fresno, california. Lichtman, Golden, and Dvorsky resided in California when they filed their petitions. 1. The Purchase of Hollenbeck by Petitioners
On May 10, 1968, Lichtman, Golden, and Dvorsky (sometimes referred to collectively as petitioners) purchased the Hollenbeck Terrace Apartments (Hollenbeck or the property), a complex consisting of land, 19 triplex buildings, one 14-unit building, and miscellaneous personal property. *119 All income subsequently derived from the property was allocated among petitioners in accordance with their respective interests in it as follows: Lichtman--50 percent; Golden--10 percent; and Dvorsky--40 percent. At the time of its purchase, Hollenbeck was encumbered by deeds of trust executed in favor of Eureka Federal Savings and Loan (EFSL) as security for 20 loans with outstanding balances totaling $782,325.38. The promissory notes evidencing these loans, as well as the related deeds of trust, each contained a "due on sale" clause. [2] However, in consideration of a $2,000 "assumption fee" paid by petitioners, EFSL agreed to refrain from calling for payment of the balance due on the loans and to permit petitioners to assume the loans with no change in the interest rate of 6.5 percent per annum. In this connection, petitioners signed an "Assumption Agreement" providing in part that they would be jointly and severally liable with the sellers of Hollenbeck, Mario and Caroline Santacroce (Santacroce), for all sums due under the promissory notes and related deeds of trust. Under the agreement, EFSL reserved the right to exercise the "due on sale" clauses in the notes and deeds *120 of trust upon any subsequent transfer of the property. Shortly before signing the Assumption Agreement, petitioners received a letter, dated April 25, 1968, from James C. Foster, Assistant Secretary of EFSL, stating as follows: Pursuant to your request, it is hereby agreed that your execution of the Assumption Agreement re our loans on the above properties [i.e., Hollenbeck] is for identification purposes, and acknowledgement by you of the terms and conditions of the obligation you are assuming. You are hereby released from any personal liability that may be implied by your execution of the Assumption Agreement. In addition to assuming the EFSL loans encumbering Hollenbeck, petitioners gave Santacroce a $150,000 promissory note bearing interest at 8 percent per annum and secured by a second deed of trust on the property. Petitioners paid Santacroce $35,000 of the principal *121 amount of this note prior to August 1973; the balance of $115,000 was not due until May 7, 1978. From August 1973 through May 1978, monthly interest payments of $766.67 were the only amounts due on the Santacroce note. Of their initial basis in the property, $1,020,753, petitioners allocated $66,003 to the personal property and $954,750 to the improved real property. [3] They claimed depreciation deductions related to Hollenbeck on their respective income tax returns for the years 1968 through 1973 in amounts totaling $243,691; of this amount, $50,496 was claimed with respect to the personal property and $193,195 was claimed with respect to the improved real property. On January 1, 1974, petitioners' adjusted basis in the property was as follows: [4]
Personal property
$ 15,507
Improved real property
761,555
$777,062
*122 Petitioners computed depreciation on the improved real property under an accelerated method. As a consequence, the depreciation deductions claimed by them exceeded the deductions which would have been allowable under the straight-line method for years prior to 1970 in the total amount of $19,894 and for the years 1970 through 1973 in the total amount of $28,495. As of January 1, 1974, only 54 percent of the pre-1970 accelerated depreciation was subject to recognition as ordinary income under section 1250. [5]
From the time of its purchase in 1968 through the end of 1973, Hollenbeck was managed for petitioners by property management agents and was operated as a "rental for investment purposes." Throughout this period, loan payment notices, annual mortgage statements, insurance expiration notices, and late payment notices pertaining to Hollenbeck were sent by EFSL to petitioners in care of their management agents. The management agents paid all expenses connected with the property, including debt service on the EFSL and Santacroce notes, *123 from monies earned in renting the property and from funds petitioners advanced to them for this purpose when rents were insufficient to cover expenses. 2. The Sale of Hollenbeck to Paye
In 1973, because the property was losing money, petitioners began making inquiries to determine whether it was salable. They were eventually contacted by John Paye (Paye), a real estate investor and an attorney admitted to practice in California who was interested in purchasing the property. During late 1973, they met with Paye several times to discuss terms for a sale of the property. Initially, Paye proposed a transaction which included a transfer to petitioners of two vacant lots owned by him as part of the consideration for Hollenbeck. Under this proposal (the "exchange proposal"), Hollenbeck was to remain encumbered by the EFSL and Santacroce deeds of trust, and payments due under the related promissory notes were to be made by Paye. However, the exchange proposal, which was made in writing, was rejected by petitioners because they believed that the lots owned by Paye were worthless. Paye and petitioners discussed modifications of the exchange proposal, and their negotiations *124 culminated in the execution of an agreement on December 3, 1973, styled as a "Lease Agreement & Option to Buy" (the "sale agreement"). [6] Under this agreement, Paye as "Tenant" took Hollenbeck from petitioners as "Landlord" for a term of 25 years commencing on January 1, 1974, "unless sooner terminated" as provided in the agreement. The sale agreement stated that: "This Lease is subject to the underlying loans and Deed of Trusts [sic] held by * * * EFSL and * * * Santacroce." The sale agreement further stated in this connection as follows: *125 Landlord warrants that he will make monthly loan payments on the subject property to * * * [EFSL] and the monthly interest payments on the promissory note held by * * * Santacroce. Verification of such payments shall be provided to the Tenant on a monthly basis. The sale agreement called for the payment by Paye of an "annual rental" in monthly installments equivalent to the sum of the following items: 1. Commencing January 1, 1974, an amount sufficient to meet the debt service requirements of the notes held by EFSL, with the first payment reduced by the interest due on the loans for the month of December 1973. As of January 1, 1974, the principal amount of the EFSL notes was approximately $740,000; monthly debt service on those notes was approximately $7,337. 2.Commencing February 1, 1974, an amount equal to the monthly interest due on the note held by Santacroce, i.e., $766.67. 3. Also commencing February 1, 1974, monthly payments of $533. Accordingly, beginning in February 1974, Paye was liable for monthly "rent" payments under the sale agreement in the total amount of $8,636.67 ($7,337 + $766.67 + $533). In addition to this monthly "rent," the sale agreement *126 called for a "lump sum rental payment" on May 7, 1978, in the amount of $80,000 plus a sum equal to the balance due on the Santacroce note ($115,000). The sale agreement provided that payment of this "lump sum rental" could be made before May 7, 1978, and that such payment would "reduce and or eliminate pro-rata" that portion of the monthly "rent" consisting of the interest due Santacroce, $766.67, and the $533 payment.[7] Thus, after payment of the lump sum, the monthly "rent" was to be equal to the amount of the debt service on the EFSL notes. The sale agreement placed responsibility on Paye for all expenses incurred in maintaining and operating Hollenbeck, including the cost of any structural alterations, during the term of his "tenancy." Paye was also required to maintain insurance on the property to the extent that it was not insured under existing "Trust *127 Fund agreements" with EFSL. [8]
As to the existing leases and deposits, the sale agreement provided: e. Leases and Deposits. By January 1, 1974, the Landlord shall deliver a rent roll to the Tenant. Landlord shall assign to Tenant all leases and tenancies then existing and pay to Tenant by January 10, 1974, all security and cleaning deposits received from tenants or occupants of the Property. The Tenant will assume all of the Landlord's lease obligations, as so disclosed, as of January 1, 1974.Provided that Landlord shall remain liable for, and agrees to hold Tenant harmless and indemnify Tenant from, any and all claims and damages that arise out of events or incidents on or about the Property, or in any way arising out of the Landlord's management of the property, prior to January 1, 1974, and that would not be a liability of or claim against Tenant absent tenant's assumption of the aforesaid lease obligations. Landlord warrants that the leases are in full force and effect according to their terms. An "Option to Buy" was *128 set forth in the sale agreement as follows: F. OPTION TO BUY
1. For and in consideration of the sum of One Dollar, receipt of which is hereby acknowledged, Landlord grants to Tenant the exclusive right and option to purchase Hollenbeck * * * upon the following terms and conditions: a. Said option shall be exercisable at any time during the term of this lease upon thirty days written notice by certified mail to Landlord. b. Rental payment of $80,000 or its negotiated equivalent paid to Landlord. c. Tenants assumption or payment of the promissory note held by * * * Santacroce and secured by a Deed of Trust on the subject property. d. A total purchase price in addition to items (F,1,b and c) equal to the balance of the then existing loans on subject property held by * * * [EFSL] plus one dollar. At time of such option exercise Tenant shall assume all of Landlord's interest and claims to any and all trust funds associated with the loans held by * * * [EFSL]. The sale agreement, effecting a transfer of (without a change in title to) the property to Paye on January 1, 1974, was originally drafted in the form of a purchase and sale agreement. However, Paye *129 wanted to avoid various costs, including an increase in the rate of interest, which would have resulted from an outright assumption of the EFSL loans. [9] Further, he was afraid that EFSL might accelerate the repayment of the loans (by exercising the "due on sale" clauses) rather than permit him to assume them. The agreement was written in its final form, as discussed and quoted in part above, in order to circumvent the "due on sale" provisions in the notes and deeds of trust held by EFSL. Although styled as a "Lease Agreement & Option to Buy," petitioners and Paye intended that the sale agreement effect a sale of the property, and they construed the terms of that agreement as being the terms of a purchase and sale agreement. Subsequent to January 1, 1974, loan *130 payment notices, annual mortgage statements, insurance expiration notices, and late payment notices pertaining to Hollenbeck were no longer sent to petitioners in care of their property management agents (Grubb & Ellis); instead, EFSL sent such documents to petitioners in care of Paye.This arrangement came about as a result of (1) notice to EFSL from petitioners that Paye was "replacing Grubb & Ellis as the responsible person to forward the loan payments" and (2) notice from Grubb & Ellis to EFSL that it would no longer be the agent for Hollenbeck and that "all bills should be directed to the account of Hollenbeck * * * c/o John Paye, owner." EFSL files were altered to reflect the change in address; [10] however, those files continued to show petitioners as the owners of Hollenbeck. Although the terms of the sale agreement stated that "rent" would be paid to petitioners and that they would make the *131 required loan payments to EFSL and Santacroce, such loan payments were in fact made by Paye directly to EFSL and Santacroce. Petitioners did not themselves make such payments at any time after January 1, 1974. In addition to paying debt service on Hollenbeck, Paye made monthly interest payments to petitioners with respect to Hollenbeck in the amount of $566.67 [11] during 1974, 1975, and part of 1976. On several occasions after January 1, 1974, petitioners and Paye were notified by EFSL that Hollenbeck debt service payments were delinquent; in this connection, EFSL threatened foreclosure action at least once. Upon receiving such notification from EFSL, petitioners contacted Paye and took other steps in order to make sure that Paye made the required payments to EFSL. It was petitioners' understanding that Paye was fully responsible for taking care of the debt service on Hollenbeck. Petitioners were concerned that they might have to take the property back and lose the equity they were to receive from the sale to Paye (i.e., $80,000) if he did not make the payments to EFSL. Paye believed that EFSL would foreclose upon the property if he did not *132 make those payments. As noted above, petitioners did not make such payments at any time after the property was transferred to Paye. 3. The sale of Hollenbeck to Third Parties
During the summer of 1976, Paye negotiated and arranged for the sale of Hollenbeck to third parties. Petitioners took no part in the negotiations; they ultimately became involved in the sales transaction only because legal title to Hollenbeck was in their names and, therefore, it was necessary for them to sign the deeds transferring the property to the third parties. From the proceeds of an escrow account established in connection with this sale, the balance due on the promissory notes held by EFSL and Santacroce was paid, petitioners were paid $80,000, and Paye received all remaining amounts. 4. Reported Tax Consequences of the Sale to Paye
Hollenbeck was purchased by Paye in connection with the formation of a limited partnership, in January 1974, to which he transferred "all of his rights of ownership" to the property under the sale agreement. [12] The partnership was formed solely for the purpose of acquiring and operating Hollenbeck. On the partnership's Federal income tax return for 1974, *133 a deduction for interest expense was claimed in the amount of $59,565. In addition, a deduction for depreciation was claimed, computed upon the following reported basis in the property: Land
$ 250,000
Building
804,866
Personalty
75,100
Total
$1,129,966
For 1975, the partnership claimed a deduction for interest expense in the amount of $63,380. On their Federal income tax returns for 1974, 1975, and 1976, petitioners reported the 1974 transfer of the property to Paye as an installment sale. None of the details (such as gross sales price, basis in the property, or gross payments received from the sale) concerning the transaction are shown on the returns filed by Dvorsky for those years or on the returns filed by Lichtman and Golden for 1976. However, the returns filed by Lichtman and Golden for 1974 and 1975 indicate *134 in part as follows: Lichtman
1974
n1 1975
Improved
Personal
Real
Property
Property
Total
Gross sales price
$38,138
$951,715
$989,853
$951,720
Adjusted basis
38,138
736,169
774,307
736,170
Total gain (gross profit)
215,546
215,546
215,550
Contract price
38,138
951,715
989,853
951,720
Payments received: In Year of sale
3,190
76,568
79,758
n2 79,760
In current year (if
sale in prior year)
78,032
Golden
[1] 1974
[1] 1975
Gross sales price
$951,720
$951,720
Adjusted basis
736,170
736,170
Total gain (gross profit)
215,550
215,550
Contract price
951,720
951,720
Payments received: In year of sale
[2] 79,760
[3]
In current year (if sale in prior year)
78,030
*135 Lichtman, Golden, and Dvorsky reported various items of income and claimed deductions in connection with the sale of Hollenbeck to Paye as follows: Interest Income
1974
1975
1976
Lichtman
$13,293
$13,005
$7,994
Golden
2,659
2,601
1,599
Dvorsky
10,634
10,404
6,396
Long-Term Capital Gain
1974
1975
1976
Lichtman
$8,672
$8,836
$99,212
Golden
1,806
[1]
19,842
Dvorsky
6,937
7,069
79,370
Interest Expense
1974
1975
1976
Lichtman
$29,367
$30,920
$14,904
Golden
5,873
6,184
2,981
Dvorsky
23,494
24,736
11,924
The amount of the interest income reported by petitioners was determined under the imputed interest rules of section 483 on the theory that all sums which Paye was required to pay under the lease agreement represented amounts received by petitioners for the sale of the property with respect to which there was unstated interest. In other words, petitioners treated the amounts paid by Paye to EFSL and Santacroce, *136 as well as the amounts he paid directly to petitioners, as "gross collections" for purposes of computing imputed interest. The amount of the interest expense deductions claimed by petitioners represents the interest which was due on the notes held by EFSL and Santacroce and which was paid by Paye. Petitioners did not treat the sale to Paye as being "subject to" the encumbrances represented by the EFSL and Santacroce notes and deeds of trust within the meaning of section 1.453-4(c), Income Tax Regs. Accordingly, petitioners did not include the amount of the balance due on the notes in excess of their basis in the property as a payment to them in the year of the sale.Further, petitioners included the total balance due on the notes, rather than only the amount in excess of their basis, in the "total contract price" of the property. Thus, petitioners computed and used a "gross profit percentage" (gross profit divided by total contract price) for installment reporting purposes of approximately 22.65 percent. In the notices of deficiency issued to Lichtman and Golden, respondent determined that all amounts received by them from Paye prior to the 1976 sale to third parties represented *137 rental income. The notices stated that-- Alternatively, if it is held that a disposition of Hollenbeck * * * in fact took place in 1974, then adjustment under section 483 of the Internal Revenue Code will be required. The petitions filed by Lichtman and Golden alleged that they had sold Hollenbeck to Paye on January 1, 1974. By way of amended answers, respondent receded from his position that no sale of the property took place until 1976, and he adopted the position of Lichtman and Golden concerning the year of sale. He further alleged that Paye took the property "subject to" the indebtedness secured by the deeds of trust, with the result that Lichtman and Golden (1) must include their share of the amount of the indebtedness in excess of basis in the property as a payment received in the year of sale, (2) are not entitled to deductions for interest paid to EFSL and Santacroce during 1974, 1975, and 1976, and (3) must include as interest income their share of the monthly payments made by Paye to petitioners. Subsequent to the filing of the amended answers in the Lichtman and Golden cases, respondent issued a notice of deficiency to Dvorsky. In that *138 notice, respondent determined a deficiency based on essentially the same grounds alleged to support the position taken by respondent in the amended answers in the Lichtman and Golden cases. OPINION Section 453(a) and (b) [13] provides, in substance, that a taxpayer who has elected the installment method of reporting gain from the sale of real estate may report as gain a fraction or proportionate part of the sale price payments actually received in the taxable year. That fraction is the anticipated "gross profit" from the sale over (or divided by) the "total contract price." Thus, the larger the "total contract price" in relation to the "gross profit," the smaller will be the fraction (or percentage) of the gain to be reported as income each taxable year. *139 To safeguard the fisc, both section 453 and its implementing regulations contain precise provisions on the formula for composing the fraction for measuring the annually taxable portion of the gain. The term "total contract price" as used in the section 453(a) formula is one of art. In the ordinary sale of real property, the total contract price is the same as the amount paid to the seller--cash, notes, and other property, including new mortgage notes. When an existing mortgage is allowed to remain on the property, however, determination of the total contract price is more complicated. In Stonecrest Corp. v. Commissioner,24 T.C. 659 (1955), this Court held that a purchaser may assume such a mortgage, take the property subject to the mortgage, or follow neither course. [14] If the purchaser takes the property subject to the mortgage or assumes it, section 1.453-4(c), Income Tax Regs., [15] provides that the amount of the mortgage shall be included in the total contract price only to the extent that it exceeds the basis of the property; such excess of the mortgage over the basis is treated as part of the initial payment in the year of sale. Burnet v. S. & L. Bldg. Corp.,288 U.S. 406, 414 (1933). *140 In Stonecrest Corp. v. Commissioner,supra at 667, the Court held that, if the purchaser neither assumes the mortgage nor takes the property subject to it, this regulation limiting the amount of the total contract price does not apply. [16]
*141 The Court explained the concept of taking property "subject to" a mortgage in Stonecrest Corp. v. Commissioner,supra at 666, as follows: Taking property subject to a mortgage means that the buyer pays the seller for the latter's redemption interest, i.e., the difference between the amount of the mortgage debt and the total amount for which the property is being sold, but the buyer does not assume a personal obligation to pay the mortgage debt. The buyer agrees that as between him and the seller, the latter has no obligation to satisfy the mortgage debt, and that the debt is to be satisfied out of the property. Although he is not obligated to, the buyer will ordinarily make the payments on the mortgage debt in order to protect his interest in the property. 5 Tiffany, Law of Real Property, secs. 1435, 1436 (3d ed. 1939); IV American Law of Property, secs. 16.125, 16.127, 16.128-16.132 (1952). [17]
*142 The Stonecrest Court, supra, at 667-668, explained why the purchaser in that case neither assumed nor took the property subject to the mortgage as follows: As we have pointed out, assumption of a mortgage means that the buyer takes over the seller's obligation to the mortgagee and incurs an obligation generally enforceable by the mortgagee. Here, as the parties have stipulated, the buyer was under no present obligation to the mortgagee. Nor was any sale made by petitioner "subject to" a mortgage in the ordinary usage of that expression. The expression means that the buyer has no personal obligation to pay the mortgage debt; that, as between seller and buyer, the seller has no obligation to pay the debt; and that the debt is to be satisfied from the property. Here there was no understanding that the debt was to be satisfied out of the property; instead it was explicitly provided in the agreement of the parties that the seller was to make the payments on the mortgage debt until there was a conveyance of the property. It has been stated that in determining whether or not a transfer is subject to a mortgage, A circumstance which is usually of controlling importance in *143 this regard is whether the mortgage was considered in adjusting the purchase price. If the price was reduced by reason of the mortgage, it is a reasonable conclusion that it was intended that the debt, either in whole or in part, should be imposed on the land in the hands of the transferee rather than on the transferor, while if the full agreed value of the land was paid, it may be concluded that the parties intended the grantor to pay the mortgage debt out of the proceeds of the sale.[Tiffany, sec. 1435, p. 365.] Based on Stonecrest Corp. v. Commissioner,supra, and its progeny, the parties agree that a two-prong test must be met in order to find that Paye took Hollenbeck "subject to" the mortgages: (1) It must appear that petitioners were paid for their redemption interest; and (2) It must appear that, as between petitioners any Paye, it was agreed that petitioners would have no obligation to satisfy the mortgage debt, but rather the debt was to be satisfied only out of the property. Respondent argues that the full amount of petitioners' gain is taxable in 1974 because they sold Hollenbeck subject to the EFSL and Santacroce mortgages; therefore the *144 total contract price includes only the excess of the mortgage indebtedness over the adjusted basis, and, in this case, equals the gross profit. [18] Respondent's computations are as follows: Gross Profit: Selling price
$935,000
Adjusted basis
777,062
Gross profit
$157,938
Total Contract Price: Cash payment to be made
$ 80,000
Mortgages to which property was subject: EFSL
$740,000
Santacroce
115,000
Total mortgages
$855,000
Adjusted basis
777,062
Excess of mortgages over basis (treated as
cash payment)
$ 77,938
Total contract price
$157,938
Thus, the gross profit equals the total contract price. Petitioners' *145 computations are more complicated. They arrived at a total sale price of $1,339,822 by including the total amount required to be paid under the sale contract: EFSL debt service (147 months), Santacroce interest (to May 1978), Santacroce principal, monthly interest on the $80,000 lump sum payment (51 months), and the $80,000 lump sum. From this total sale price, petitioner subtracts interest of $309,988, imputed under section 483, to arrive at a net sale price (or discounted value) of $1,029,834. The computation of gross profit is made accordingly: Selling price
$1,029,834
Adjusted basis
777,062
Gross profit
$ 252,772
Petitioner would have us treat the selling price of $1,029,834 as the total contract price so that the taxable fraction of their monthly receipts would be $252,772 over (or divided by) $1,029,834, i.e., 24.5 percent. [19]
*146 Petitioners argue that clause G.1.h. of the sale agreement, which is as follows, provides a complete answer: Landlord [petitioners] warrants that he will make monthly loan payments on the subject property to * * * [EFSL] and the monthly interest payments on the promissory note held by * * * Santacroce. Verification of such payments shall be provided to the Tenant [Paye] on a monthly basis. But, as we shall discuss, Paye actually made the mortgage payments; petitioners made no payments even when foreclosure was threatened. And petitioners admit that they never provided any verification to Paye that the payments had been made. Petitioners cannot have it both ways, contending that the agreement though cast in the terms of a lease was actually a sale but was nonetheless "a bona fide written agreement embodying the entire contract between petitioners and John Paye for the transfer of the property." We do not think clause G.1.h. impairs a finding that Paye took the property subject to the mortgage any more than the fact that payments on the purchase price were designated as rent impairs a finding that the agreement was intended to effect a sale, as both parties concede. Moreover, *147 another clause (A.2.) of the sale agreement provides: This Lease [conceded by both parties to be the sale] issubject to the underlying loans and Deeds of Trust [i.e., mortgages] held by * * * [EFSL] and * * * Santacroce * * *. [Emphasis added.] And, consistent with this latter provision, the facts are that the parties, both Paye and petitioners, treated the transaction as if the EFSL and Santacroce debts were to be satisfied only out of the property. In the light of all the evidence, we think clause G.1.h. of the sale agreement was simply part of the facade created to avoid triggering the due on sale clause; it does not obviate the Stonecrest test. We think that, as to the first element of the two-pronged Stonecrest test, the only reasonable inference is that petitioners negotiated for and received their net equity or redemption interest in the property. There is no credible basis for holding, in the words of 5 Tiffany, Law of Real Property, sec. 1435, p. 365, quoted in Stonecrest Corp. v. Commissioner,supra at 667, that the mortgages were not "considered in adjusting the purchase price." Petitioner Golden testified that, in *148 the negotiations with Paye, petitioners were "looking for $100,000" in cash as their "net equity"; they finally settled on a smaller amount of $80,000. According to the sale agreement, the cash payment was to be $80,000, with interest at 8 percent or $533 per month until paid, [20] and it was to be paid on or before May 7, 1978. The remainder of Paye's obligations was measured by the amount of the mortgages, and all payments on those obligations were made to the mortgagees. When the property was resold in 1976, petitioners received in cash their equity or redemption interest and the mortgages were discharged. At that point, petitioner conveyed legal title to Paye's designees. As we read Stonecrest Corp. v. Commissioner,supra, *149 and the authorities it cites, for a sale to be subject to a mortgage there is no requirement, as argued by petitioners, that the net equity or redemption be paid at the time of the sale, in the instant case on January 1, 1974. Many sellers of real estate receive part of their equity in the form of a second or third mortgage on the property; petitioner's retention of legal title to the property until they received the $80,000 in cash gave them, in substance, a secured obligation in that amount, junior to the EFSL and Santacroce mortgages. Taggart v. Cal-Linda Packing Co.,146 Cal. App.2d 545, 304 P.2d 172, 174 (1956); Sherman v. Quinn,31 Cal. App.2d 661, 192 P.2d 17, 19 (1948). Paye's secured promise to pay petitioners their net equity on or before May 7, 1978, was sufficient to meet the first prong of the Stonecrest test. See Goodman v. Commissioner,74 T.C. 684, 692 (1980), affd. 673 F.2d 1332 (7th Cir. 1981); cf. Voight v. Commissioner,68 T.C. 99 (1977), affd. per curiam 614 F.2d 94 (5th Cir. 1980). As to the second prong of the Stonecrest test--that, as between Paye *150 and petitioners, petitioners would not be obligated to pay the mortgage debt but rather it was to be satisfied out of the property--we think it relevant that petitioners were careful to avoid undertaking any personal liability for the EFSL debt when they acquired Hollenbeck. Although petitioners formally assumed the EFSL loan at that time, they obtained the April 25, 1968, letter from EFSL, quoted in our findings, releasing them from "any personal liability that may be implied by your execution of the Assumption Agreement." As a result of this release from personal liability, the debt to EFSL could be satisfied only out of the property. We think it unlikely that petitioners, who had exacted from EFSL a release from personal liability when they bought the property, would have deliberately committed themselves personally to Paye to discharge the mortgages even if that obligation was coupled with an agreement by Paye to make monthly payments equal to the required debt service. The risks of undertaking personal liability were self evident in 1973 and 1974. As detailed in our findings, petitioners in 1973 were losing money from the management and operation of Hollenbeck. Petitioner *151 Golden testified that the "cash flow was negative," and he and the other co-owners were called upon "from time to time to put up additional funds to keep the property going." He further testified that he "had a friend look at the property who didn't feel that it was worth the amount of the loans and so we were anxious to dispose of it." Petitioner Lichtman testified that in 1973 a real estate broker advised them that he "did not think it was a very salable property as such." The testimony, moreover, is unmistakeably clear that in the initial negotiations, the parties agreed that Paye, not petitioners, was to make the mortgage payments. Paye testified that he was to take the property subject to the EFSL mortgage and, as between him and petitioners, they would not be responsible for making the payments thereon. [21] There is no suggestion that in the ensuing negotiations Paye sought to require petitioners to make themselves personally liable for the EFSL mortgage payments; it is unlikely they would have volunteered. Moreover, there is no evidence to indicate that petitioners or Paye sought in the final negotiations to alter the original arrangement with respect to the mortgages for *152 any reason other than to camouflage the transaction as a lease in order to circumvent the EFSL due on sale clause. In fact, clause A.2., quoted above, expressly providing that the transaction was to be "subject to" the mortgages, was included in the agreement as signed. Given this original intention and other inconsistencies and ambiguities in the sale agreement, we must be careful to examine all the facts and circumstances surrounding the transaction to ascertain whether Paye took Hollenbeck subject to the mortgage or, as between him and petitioners, they obligated themselves to pay the mortgages. Goodman v. Commissioner,supra at 712-713 (holding that, in substance, property was taken subject *153 to mortgages). Cf. Waldrep v. Commissioner,52 T.C. 640 (1969), affd. per curiam 428 F.2d 1216 (5th Cir. 1970); Voight v. Commissioner,supra at 114 (both holding that a mortgage had been assumedin substance, though not in form). Obviously, we cannot look only to the literal terms of the sale agreement for it is cast in the terms of a lease with an option to buy, and both parties agree that it actually effected a sale.In this area, as in other fields of taxation, a court must look "to the objective economic realities of a transaction rather than to the particular form the parties employed." Frank Lyon Co. v. United States,435 U.S. 561, 573 (1978).And the actions of the parties to a contract are important in ascertaining the meaning. Cf. Helfrich's Estate v. Commissioner,143 F.2d 43, 46 (7th Cir. 1944), affg. 1 T.C. 590 (1943). Significantly, all mortgage payments were actually made by Paye directly to EFSL and Santacroce. Petitioners did not themselves make such payments even under a threat of foreclosure. And the testimony of petitioner Lichtman as well as Paye shows that *154 the actual understanding of the parties was that, as between petitioners and Paye, Paye was to be responsible for payment of the mortgages. [22] When Paye was delinquent, petitioner Lichtman testified that he was concerned that, "if there was going to be a default," petitioners would have to assume responsibility for the property and they would lose the equity they would receive on the sale. Petitioner Golden testified that he was concerned that he would be required to take the property back. None of petitioners' testimony suggests that they were concerned about having undertaken any personal obligation to pay the mortgage debts for the purpose of relieving the property of the indebtedness in Paye's hands. [23] While some of the testimony on this point comes close to showing that Paye actually assumed the mortgages, we think a more reasonable interpretation of the evidence is that both petitioners and Paye looked to the property as the only enforceable source for payment of the mortgage indebtedness. Thus, the second prong of the test is met. *155 Petitioners discount the fact that Paye actually made all mortgage payments directly to the mortgagee after January 1, 1974, until he sold the property to third parties on the theory that he was merely petitioners' agent in making such payments. They analogize Paye's situation to that of the property managers who handled Hollenbeck for them prior to January 1, 1974. But there were crucial differences. There is no concrete evidence of any agency relationship. Paye insists he made the payments as owner, and petitioners offered no evidence to show that Paye consented to serve as their agent. Restatement, Agency, sec. 15; see Petty v. Commissioner,77 T.C. 482, 488-489 (1981). Petitioners had assigned the leases and rents from Hollenbeck to Paye, and Paye owned and operated the property on his own account. Prior to the sale, peititoners provided personal funds when they were needed for delinquent mortgage payments. After the sale, petitioners looked to Paye to cover the mortgage payments, if necessary, from his personal funds. Further, the property managers handled the property pursuant to management contracts for a fee. Paye discharged the mortgages to protect *156 the equity that he had acquired in the property in precisely the same manner as one ordinarily does when he takes property subject to a mortgage. We find that an agency relationship did not exist between Paye and petitioners, and that Paye made the mortgage payments from his own funds in order to prevent foreclosure of the liens. The facts of this case are not comparable to the facts in Stonecrest Corp. v. Commissioner,supra, and Lamberth v. Commissioner,supra, in each of which the seller of the property retained full responsibility for the payment of the mortgage until the property was deeded to the buyer.In those cases, the buyer paid the seller an amount equal to the mortgage payments plus an amount sufficient to pay off the contract price of the house. The payments due from the purchaser to the seller were not syncronized in time and amount with the payments due on the mortgages. The payments, moreover, went into the seller's general funds, and the obligation to make the mortgage payments rested solely on the seller. Here, as we have found, Paye was responsible, as between him and petitioners, for making the mortgage payments directly *157 to the mortgagees; he made them out of his own funds, and no payments except the interest on the $80,000 obligation were made to petitioners. See Goodman v. Commissioner,supra at 713. In principle, the instant case is more comparable to Waldrep v. Commissioner,52 T.C. 640 (1969), affd. per curiam 428 F.2d 1216 (5th Cir. 1970). In that case, the purchaser of property made payments directly to the mortgagee, as in the instant case; the Court found from all the facts an implied promise to assume and pay the existing mortgage. Although an argument could be made that Paye assumed the mortgages in the instant case, we think that, for the reasons stated above, Paye took the property in 1974 subject to the mortgages. Petitioners complain that they are being taxed with gain in 1974 when they received no cash payment in that year. However, they had taken accelerated depreciation deductions in earlier years (totaling $243,691 from 1968 through 1973), and to the extent that the mortgages exceeded their basis for Hollenbeck ($77,938), they thereby anticipated the 1974 gain. Such excess is taxable as part of the initial payment. Burnet v, S. & L. Bldg. Corp.,288 U.S. 406, 414 (1933). *158 Moreover, in 1974, they received over $6,000 in cash as interest on the $80,000 lump sum payment which was to be made on or before May 7, 1978, and were relieved of monthly interest payments of $766.67 to Santacroce and monthly debt service on the EFSL mortgage of $7,337, a total amount in excess of $97,000 for the year. True, Paye received the rents, but petitioners were anxious to sell Hollenbeck because the rents were not adequate to assure a positive cash flow. It is also relevant, we think, that petitioners' disappointment stems in large part from their participation in a plan to mislead EFSL by circumventing the due on sale clause in its mortgage. In the light of the entire record, we find that petitioners' actual agreement with Paye was that "only part of the total selling price would be paid directly to the seller by the purchaser, the remaining part being paid by the buyer directly to the mortgagee." Estate of Lamberth v. Commissioner,supra at 315. Therefore, we hold that Paye took Hollenbeck subject to the mortgages. Compare Goodman v. Commissioner,supra at 714. Viewing the transaction in this light, we find that the selling *159 price of the property was $935,000, computed as follows: [24]
$740,000
Principal amount of EFSL note on January 1, 1974
115,000
Principal amount of Santacroce note on January 1, 1974
80,000
Lump sum payment due no later than May 7, 1978
$935,000
Total
This *160 amount is generally consistent with the amount reported on the Lichtman and Golden returns for 1974 and 1975 and reflects the terms of a sale "subject to" the "mortgages." Respondent's computations set forth above are thus correct. Having so decided, it follows that petitioners are not entitled to any deduction for the interest paid to EFSL and Santacroce by Paye. See sec. 1.163-1(b), Income Tax Regs. Further, petitioners must report interest income based on the monthly payments of $566 to them by Paye, which payments represented interest on the $80,000 paid to petitioners for their equity in the property (i.e., the $80,000 was paid for their "redemption interest" as described in Stonecrest Corp. v. Commissioner,supra). They are not required to take into income section 483 imputed interest income on any part of the sale price. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: D. Daniel Golden and Jerrol E. Golden, docket No. 14250-78, and Harry S. Dvorsky and Isobel Dvorsky, docket No. 7981-80.↩
1. It is agreed that respondent bears the burden of proof with respect to the increased amount of the deficiency for 1974.↩
2. The "due on sale" clause reads as follows: In the event of sale or transfer of the real property or any portion thereof covered by the Deed of Trust securing this note, the entire balance of the principal and interest shall, at the option of the holder hereof, become immediately due and payable.↩
3. The record does not indicate why there was no separate allocation of basis to the land, and no question has been raised in this connection. ↩
4. As discussed, infra,↩ petitioners sold Hollenbeck on Jan. 1, 1974. It is stipulated that the amount of the price paid to petitioners for Hollenbeck to be allocated to the personal property is equal to the adjusted basis of such property.
5. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
6. To reduce confusion, this "Lease Agreement & Option to Buy" is referred to herein as the "sale agreement" because petitioners Lichtman and Golden alleged in paragraph 6(b) of their petitions that the agreement "was intended by the parties thereto, and was so construed by the Petitioners, their co-venturer and said John Paul Paye as a sale of the property, and the terms of said agreement are the terms of a purchase and sale agreement." By paragraph 8(c) of his amended answer, respondent "adopts the position of petitioners with respect to the year of sale of the property." In essence, petitioners Dvorsky and respondent also agree that the "Lease Agreement & Option to Buy" effectuated a sale of the property in 1974. Also, the parties have tried and briefed the case on the premise that the agreement effected a sale as of Jan. 1, 1974.↩
7. Although designated as part of the "rent" in the lease agreement, this latter amount represented 8 percent interest on the $80,000 portion of the lump sum payment called for by that agreement. As more fully discussed, infra,↩ none of the amounts designated as rent in the lease agreement actually represent rent.
8. Apparently, a portion of the monthly payments to EFSL was held in a special fund to cover the cost of insurance and taxes on the property.↩
9. At the time the sale agreement was executed, if EFSL approved the assumption of a loan, its policy was to increase the rate of interest on the loan to the then current market rate. With respect to the loans encumbering Hollenbeck, Paye believed that an assumption of the loans would produce an increase in the rate of interest from 6.5 percent (the rate at which petitioners had assumed the loans) to between 8.5 and 9 percent.↩
10. Due to an apparent error on the part of EFSL, documents concerning one of the 20 loans related to Hollenbeck continued to be addressed in the name of petitioners in care of Grubb & Ellis, but the street address used on documents with respect to all 20 loans was that of Paye.↩
11. See fn. 19, infra.↩
12. The partnership agreement states that the sale agreement "is to be replaced by a Grant Deed from LICHTMAN, DVORSKY, and GOLDEN to the * * * [partnership] no later than the due date of the Santacroce note." That date, May 7, 1978, was the same date that the $80,000 lump sum payment to petitioners was due under the sale agreement.↩
1. Apparently, on the return from which the figures in this column are derived, only the amounts allocable to the improved real property were intended to be reported. However, see note 2 to this table. ↩
2. This figure includes amounts allocable to both the personal property and the improved real property. ↩
3. It is unclear why the Golden return for 1975 showed zero as the payments received in the year of sale.↩
1. For 1975, Golden did not report any long-term capital gain, but he did report the "recapture" of $1,767 of ordinary income under sec. 1250.↩
13. Sec. 453 was substantially altered by the Installment Sales Revision Act of 1980, Pub. L. 96-471, 94 Stat. 2247, effective for dispositions of property occurring after Oct. 19, 1980, 94 Stat. 2256. As in effect during the years in question, sec. 453(a) and (b) provided in pertinent part as follows: SEC. 453. INSTALLMENT METHOD. (a) Dealers in Personal Property.-- (1) In general.--Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price. (b) Sales of Realty and Casual Sales of Personalty.-- (1) General rule.--Income from-- (A) a sale or other disposition of real property * * * may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a). (2) Limitation.--Paragraph (1) shall apply-- (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition-- (i) there are no payments, or (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.↩
14. In 5 Tiffany, Law of Real Property, sec. 1435, p. 364 (3d ed. 1939), it is stated: The transfer of the mortgaged land may be merely "subject to" the mortgage, or it may be accompanied by an agreement on the part of the transferee to pay the mortgage debt, a contract of assumption, as it is frequently called, or it may be neither. [Fn. ref. omitted.] ↩
15. Sec. 1.453-4(a) and (c) is in pertinent part as follows: Sec. 1.453-4. Sale of real property involving deferred periodic payments. (a) In general. Sales of real property involving deferred payments include (1) agreements of purchase and sale which contemplate that a conveyance is not to be made at the outset, but only after all or a substantial portion of the selling price has been paid, and (2) sales in which there is an immediate transfer of title, the vendor being protected by a mortgage or other lien as to deferred payments. (c) Determination of "selling price".↩ In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the "selling price"; and for the purpose of determining the payments and the total contract price as those terms are used in section 453, * * * the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property. * * * 16. In Estate of Lamberth v. Commissioner,31 T.C. 302, 315 (1958), this Court explained the purpose of the regulation as follows: The purpose of the regulation was to make it possible to tax the entire profit during the period the purchase moneys were being received where a sale was reported on the installment basis, and the purchaser either assumed the mortgage or took subject to it. It was not intended to apply to every sale of mortgaged property but only to those situations where only part of the total selling price would be paid directly to the seller by the purchaser, the remaining part being paid by the buyer directly to the mortgagee.↩
17. In 5 Tiffany, Law of Real Property, sec. 1435, p. 364 (3d ed. 1939), is the following explanation: By taking a transfer of the land subject to the mortgage, the transferee concedes that, as between him and the transferor, the debt is to be satisfied out of the land, and that the transferor is not, as being personally liable for the debt, under any obligation to pay it for the purpose of relieving the land in the transferee's hands.↩
18. It makes no difference in ascertaining the total contract price whether Paye assumed the mortgage or took the property subject to the mortgage. The critical distinction is, on the one hand, whether by this agreement petitioners obligated themselves to make payments on the mortgage until the property was finally conveyed, or, on the other hand, whether the obligation to the mortgagee rested with Paye (assumption) or, as between petitioners and Paye, would be satisfied out of the property (subject to).↩
19. The parties have raised a preliminary matter as to the burden of proof in the Lichtman and Golden cases. As previously noted, it is agreed that respondent bears the burden of proof as to the increased deficiencies alleged in those cases for 1974. The dispute concerns the question whether respondent raised "new matter" in his amended answers so as to fully assume the burden of proof in those cases. See Rule 142(a), Tax Court Rules of Practice and Procedure.↩ As discussed, infra, we find that respondent has shown that the property was taken "subject to" the EFSL and Santacroce notes and deeds of trust. Accordingly, it is unnecessary to make a technical determination regarding the burden of proof in these cases.
20. Paye actually paid petitioners $566 per month for at least part of the period. He testified that this amount represented 8 percent of $85,000, an earlier agreed figure, which was reduced to $80,000 due to the poor condition of part of the property. Petitioner Golden's testimony is evasive on the reason for these larger interest payments but it suggests that the larger payments were due to Paye's delinquencies. In any event, both parties agree that the payments were interest.↩
21. Paye testified: Q. How was that price of $940,000 to be paid? A. I was to assume the Eureka Federal Savings and Loan or the Eureka Federal Savings and Loan loan was to go against it, there was a note to Mario Santacroce and then the balance was to go to Dr. Lichtman and his group on a note. * * * Q. Were you going to formally assume it? A. Formally assume--no, I was taking the property subject to so there would be no personal liability. * * *↩
22. Petitioner Lichtman testified in part as follows: Q.Did you ever make the mortgage payment to the bank when he [Paye] was in default? A. No, I did not. Q. Did you expect him to make it? A. Yes, I did. Q. Was it your understanding that after the sale Mr. Paye had full responsibility for servicing the mortgages to Eureka Federal Savings and Loan? A. That had been my assumption at the time of the sale, yes. Q. Was it your understanding that after the sale Mr. Paye had full responsibility for making the mortgage payments to Mario Santacroce? A. Yes. Q. As between you and Mr. Paye, who was responsible for making the mortgage payments? A. Mr. Paye. ↩
23. See Hutchison v. Commissioner,T.C. Memo. 1981-513↩, on appeal (5th Cir., Dec. 4, 1981).
24. The purchase price of $1,029,834 advocated by petitioners is a computed artificiality with a design not only to circumvent sec. 453 but also to give petitioners the benefit of deductions for the net difference between the EFSL interest and the lower sec. 483 imputed interest; it is not supported by the record generally or by the manner in which petitioners reported gain on their tax returns. The sale agreement contains no suggestion that petitioners or Paye intended when the sale agreement was executed to incorporate implicitly the imputed interest provisions of sec. 483↩; in fact, the agreement makes no reference of any kind to the Internal Revenue Code. It is true that the purchasing partnership created by Paye may have overstated its basis in order to increase depreciation deductions, but the interest deductions claimed by that partnership are consistent with a sale subject to the mortgages.